HARLAN BAKERIES, INC., Appellant–Plaintiff/Cross–Appellee,

v.

Kelly Lee MUNCY, Kendra Marie Vondersaar, Karen Kay Muncy and Kim Sue Muncy, Appellees–Defendants/Cross–Appellants.

No. 32A01–0411–CV–469.

Court of Appeals of Indiana.

Oct. 13, 2005.

Robert L. Hartley, Thomas A. Withrow, Angie L. Ordway, Locke Reynolds LLP, Indianapolis, for Appellant.

Lawrence R. Wheatley, Danville, for Appellees.

## OPINION

CRONE, Judge.

### Case Summary

Harlan Bakeries, Inc. ("Harlan") appeals a $239,082.12 judgment in favor of four siblings, Kelly Lee Muncy, Kendra Marie Vondersaar, Karen Kay Muncy, and Kim Sue Muncy (collectively, "Muncy"; individually, by first name). We affirm in part, reverse in part, and remand for further proceedings.

### Issues

Harlan challenges numerous specific findings and conclusions entered by the trial court. Harlan asserts that the court erred by:

I. Reforming the North Boundary Line to "a line that runs through the center of an east to west running drain";

II. Reforming the West Boundary Line to be eighteen (18) feet east of the freezer building Harlan built in 2000;

III. Awarding damages based upon erroneous findings and conclusions, or speculation and conjecture, and in awarding damages that are unrecoverable under the law; and

IV. Holding Harlan in contempt of a restraining order that did not comply with Indiana law.

### Facts and Procedural History

This case, between owners of adjoining property on Production Drive in Avon, Indiana, involves disputes regarding boundaries and surface water drainage.

The parcel owned by Muncy has been in that family since approximately 1961, at some point being acquired through inheritance. Tr. at 485. Harlan owns and operates a commercial baking plant on land that it purchased in two parts: Maplehurst sold the majority of the land to Harlan in 1994; a fifth Muncy sibling, Kerry, sold a small portion of land to Harlan in 1999. Together, Harlan's parcel and Muncy's parcel form a large rectangle, with Muncy's property consisting of a smaller rectangle in the southeast corner of the large rectangle. Two common borders exist: one on the north end of Muncy's property (the "North Boundary Line") and one on the west side of Muncy's property (the "West Boundary Line"). More detailed facts follow.

In 1981 and 1982, Lewis Engineering, Inc. ("Lewis"), prepared a "Road & Drainage Plan" for Avon Production Lane Association, Inc. ("APLA"), covering an area of land that includes what is now Harlan's and Muncy's respective parcels. As per that plan, Production Drive runs east-west at the south end of Muncy's parcel and ends in a cul-de-sac. In April 1983, the Estate of Edward Muncy quitclaimed to APLA a 12.5–foot–wide strip across the south end of Muncy's parcel. Appellant's App. at 179. The quitclaim deed included an "easement for installation and maintenance of storm sewer having 10 feet on either side of" a described centerline. *Id.* In November 1983, APLA deeded, via corporate quitclaim, to Hendricks County a strip of land with a very similar legal description. *Id.* at 181–82. The corporate quitclaim noted that the deed was "subject to all easements[.]" *Id.* at 182. On both the North Boundary Line and the West Boundary Line, storm sewer pipes (hereinafter "North Storm Sewer" and "West Storm Sewer" respectively) were installed.

Sometime after the North Storm Sewer was installed, Kelly uncovered the pipe, removed a thirty-five- to forty-foot portion of it, bulldozed a depression where the pipe had been, and created a pond. Tr. at 561–63. In 1995 or 1996, Harlan President Hugh Harlan and Kelly met with a Lewis surveyor, who explained the property lines. *Id.* at 501–02. The surveyor indicated a rebar stake at the south end of the West Boundary Line. *Id.* Neither Kelly nor Hugh Harlan objected to the location of the stake, though Kelly believed that the stake was within six to twelve inches of the West Boundary Line. *Id.* at 502–03. On November 22, 1995, Lewis prepared for Harlan a site plan, which was revised on January 12, 1996 ("1996 Lewis site plan"). Appellant's App. at 264; Tr. at 144. The 1996 Lewis site plan showed the West Storm Sewer on Muncy's parcel and running parallel to and slightly east of the West Boundary Line. Appellant's App. at 264.

On February 12, 1997, Kerry signed a written agreement to sell approximately .57 acres of the north part of Muncy's parcel to Harlan. *Id.* at 143–51. As a condition precedent, Kerry agreed to "obtain fee simple title to the Premises by acquiring such" from his four siblings. *Id.* at 143. To that end, Kerry filed a partition action on March 10, 1998, against Muncy regarding the parcel. *Id.* at 155. Thereafter, Kerry learned that he could not deliver as large a parcel as he originally promised to Harlan. Tr. at 100. Harlan sought a corresponding price reduction. *See id.* at 100–01; 358–59. In conjunction with renegotiations, Hugh Harlan, Kerry, and Kelly conducted a meeting at the property. *Id.* at 511, 517. At the meeting, the North Boundary Line, which was originally going to start at an air conditioner on a certain building, was

moved to the "beehive" [1] collectors located on either end of the pond, thus making the line run through the center of the North Storm Sewer. *Id.* at 100–03, 106–08 (Hugh Harlan testimony), 514, 518 (Kelly Muncy testimony).

Harlan hired Lewis to prepare a legal description of the parcel to be purchased. *Id.* at 100–02. In a drawing prepared by Lewis at the end of April 1998, the parcel to be purchased measured 141.50 feet long by 91.00 feet wide and consisted of approximately .29 acres. Appellant's App. at 254. In a May 7, 1998 letter written to Muncy's counsel, Kerry's attorney, Kevin Hinkle, memorialized the relevant proposed renegotiated terms as follows:

> [U]pon the execution of a real estate sales and purchase agreement between Kerry and Harlan Bakeries, Kerry will agree to resolve the lawsuit by accepting a deed from your clients [Muncy] for a portion of the Real Estate described in the Complaint. That portion is roughly described as the northern tract of the Real Estate with a southern boundary that extends along a line that runs through the dead center of the existing ["North"] storm sewer in the pond.

> Harlan Bakeries must have the right to fill-in the entire pond. Kerry will seek contractual provisions with Harlan Bakeries that the fill must consist of clean dirt and that the existing storm sewer is not disturbed and remains "hooked-up." Your clients [Muncy] would still have access [to] and use of the storm sewer.

> . . . .

> In turn, Kerry will agree to dismiss the suit with prejudice and to enter into a release agreement with your clients [Muncy] that will relinquish all of Kerry's right, title and interest in and to the remaining Real Estate to your clients [Muncy].

*Id.* at 229. On or about January 22, 1999, Attorney Hinkle circulated to the title company, Muncy's counsel, and Harlan's counsel various documents provided by Lewis, including (1) a written Legal Description [2] of the parcel to be sold by Kerry to Harlan, and (2) a Plot Diagram thereof. *Id.* at 231–55; Tr. at 365–66, 375. According to the Legal Description, the parcel measured 141.50 feet long by 106.00 [3] feet wide, and consisted of approx-

---

1. Alternatively referred to as a "manhole inlet," a "beehive inlet," or a "surface collector." *See* Tr. at 580; Appellant's App. at 262, 263.

2. The Legal Description states:
 A part of the Northeast quarter of Section 11, Township 15 North, Range 1 East of the Second Principal Meridian in Washington Township, Hendricks County, Indiana, more particularly described as follows: Commencing at the Northwest corner of said Northeast quarter; thence North 88 degrees 53 minutes 00 seconds East (assumed bearing), along the North line of said Northeast quarter, 676.00; thence South 00 degrees 00 minutes 00 seconds West, 935.00 feet to the POINT OF BEGINNING of this description; thence continue South 00 degrees 00 minutes 00 seconds West, 141.50 feet; thence South 88 degrees 53 minutes 00 seconds West, 106.00 feet; thence North 00 degrees 00 minutes 00 seconds East, 141.50; thence North 88 degrees 53 minutes 00 seconds East, 106.00 feet to the POINT OF BEGINNING. Containing 0.344 acres, more or less and subject to all legal highways, rights-of-way and easements of record.
 Appellant's App. at 233.

3. It appears that a fifteen-foot strip of land was erroneously deeded to another party in 1979 but then eventually quitclaimed back to Muncy, making the 106–foot (rather than the original 91–foot) description accurate. *See* Appellant's App. at 232 (January 22, 1999 letter from Attorney Hinkle).

imately .344 acres.[4] Appellant's App. at 233. The Plot Diagram, which provided identical dimensions (of 141.50 feet by 106.00 feet) for the parcel, showed the North Boundary Line as bisecting the North Storm Sewer, and indicated that the West Storm Sewer was slightly east of the West Boundary Line. Appellant's App. at 234.

The final settlement agreement of the partition matter, signed February 12, 1999, contained the same Legal Description of the .344–acre parcel to be deeded by Muncy to Kerry as had been previously circulated by Attorney Hinkle. *Id.* at 160, 233. Departing a bit from Attorney Hinkle's letter, the final settlement agreement permitted Kerry or his transferees to drain and fill the pond "with clean fill dirt and reconnect" the North Storm Sewer "without any liability whatsoever to" Muncy, *"provided however,* that the severed Real Estate will have access to a surface water drain in the general area of the pond." *Id.* at 156 (emphasis added). Moreover, Kerry agreed to convey his interest in the remainder of the parcel to Muncy and to obtain Harlan's release of a thirty-foot ingress-egress easement across the Muncy parcel. *Id.*

Consistent with the final settlement agreement, the following transactions also occurred on February 12, 1999. Muncy deeded the .344–acre parcel to Kerry using the same Legal Description as in the final settlement agreement. *Id.* at 168. Kerry quitclaimed his remaining interest in the rest of the Muncy parcel to Muncy. *Id.* at 165–66. Kerry deeded his interest in the .344–acre parcel, again using the same Legal Description, to Harlan. *Id.* at 168. Harlan released its ingress-egress ease-

ment in the remaining Muncy property. *Id.* at 175. Kerry and Harlan entered into an amended real estate purchase agreement. *Id.* at 143–54.

Thereafter, Harlan drained the pond, reconnected the North Storm Sewer, and filled the pond. Harlan connected the North Storm Sewer using plastic (rather than concrete) pipe laid on silt and debris, which settled, causing the center of the plastic pipe to sink. Tr. at 640. Initially, Harlan filled the pond with debris rather than clean fill; approximately one year later, Harlan removed some of the debris and paved over a portion, thus elevating Harlan's side approximately twenty to twenty-four inches above Muncy's side. *Id.* at 523, 626, 120–21. A low spot remains on Muncy's side where the pond used to be. *Id.* at 527.

In early 2000, Harlan contracted with Banning Engineering, Inc. ("Banning"), to perform necessary surveying and site planning for the construction of a frozen storage warehouse and refrigeration expansion project on Harlan's parcel to the west of Muncy's parcel. *Id.* at 81–82. In or before March 2000, Banning prepared a construction grading and drainage site plan ("2000 Banning site plan") for the freezer expansion. Appellant's App. at 260. The 2000 Banning site plan, consistent with both the 1996 Lewis site plan and the Plot Diagram provided by Lewis prior to the 1999 transactions detailed *supra,* showed the West Storm Sewer on Muncy's parcel and running parallel to and slightly east of the West Boundary Line. Appellant's App. at 260, 264; Tr. at 221–25. However, the 2000 Banning site plan diverged from both the 1996 Lewis plan and the Plot Diagram in that it showed the North Boundary Line

---

4. Though no definitive explanation was provided, we speculate that the increase in size of the parcel from .29 acres to .344 acres may be due to the change in width of the parcel from 91 to 106 feet. In any event, no dispute exists regarding the acreage measurement of the parcel.

as running south of the North Storm Sewer and also indicated a proposed new storm sewer to run parallel to and west of the original West Storm Sewer. Appellant's App. at 260.[5] The 2000 Banning site plan was presented to local authorities and available for public inspection. Tr. at 123. Although setback concerns arose, Hugh Harlan had a vague recollection that a variance was received. Tr. at 139–42.

On June 2, 2000, Banning prepared for Harlan a boundary survey, which Banning revised on August 14, 2000 ("2000 Banning boundary survey"). Appellant's App. at 263. The 2000 Banning boundary survey indicated that the West Boundary Line was further east than was previously shown on the 2000 Banning site plan, the 1996 Lewis site plan, and the Plot Diagram. Tr. at 141, 217, 221–25, 232–33; Appellant's App. at 260, 263, 264, 234. The 2000 Banning boundary survey also showed the North Boundary Line as running south of the North Storm Sewer. Appellant's App. at 263. In 2000, Harlan contracted with Ultimate Thermal, Inc. for the construction of the freezer expansion project. Tr. at 78–79; Appellant's App. at 43 (Harlan's September 26, 2000 complaint, indicating that this occurred on June 30, 2000). On August 28, 2000, Harlan represented to the Hendricks County Surveyor's Office that a corrugated metal storm drainpipe (the West Storm Sewer) was buried near the West Boundary Line and needed to be removed due to field changes in the freezer project. *Id.* at 440–41. Under the assumption that the West Storm Sewer pipe was located upon Harlan's property, the Hendricks County Surveyor's Office stated that the pipe "must

be removed" and that "[a]ny drains found when the pipe is removed are to be connected to the new storm drainage system." *Id.*; Appellant's App. at 207.

Harlan began removal of the buried West Storm Sewer drainpipe along the West Boundary Line, encountered resistance from Muncy, and initiated the present litigation. Specifically, on September 26, 2000, Harlan filed its complaint for a preliminary injunction and a temporary restraining order, which also included both a request for a declaratory judgment regarding the exact locations of the two boundaries and an allegation of trespass. *Id.* at 43–48. That day, the court entered a temporary restraining order, which (1) required Muncy to remove its property encroaching on Harlan's property and to refrain from interfering with Harlan's freezer project, (2) allowed Harlan to remove the West Storm Sewer pipe, and (3) set Harlan's motion for preliminary injunction for hearing on October 3, 2000. *Id.* at 57–58.

Harlan requested a continuance, which the court granted to October 12, 2000. On October 11, 2000, Harlan faxed another request for a continuance. The following day, the court denied the request as untimely and then held a hearing at which Harlan failed to appear. While Muncy appeared at the October 12, 2000 hearing, no filings or evidence were submitted. However, after Muncy's counsel's explanation that Harlan had removed the West Storm Sewer and poured a 130–foot–long, four-foot-high, four-inch-thick, solid concrete wall, the court dissolved the temporary restraining order against Muncy and en-

---

**5.** Harlan states in its brief that the 2000 Banning site plan "does specify removal of the West Storm Sewer." Appellant's Br. at 12. Harlan includes no cite to support this assertion. Our review of the 2000 Banning site plan does not support this assertion. Further,

in an August 28, 2000 letter to the Hendricks County surveyor, Banning seems to refer to the West Storm Sewer when it stated, "our original plan did not call for its removal." Appellant's App. at 206.

tered a new restraining order prohibiting Harlan from "any further work on this matter until a full hearing can be held." Appellant's App. at 42; Tr. at 8, 10.

On October 25, 2000, Harlan filed a motion for change of judge, which was granted. On November 8, 2000, Muncy filed its answer, verified counterclaim, and request for preliminary injunction, which sought restoration of the West Storm Sewer and various damages. On November 29, 2000, Harlan filed its reply. On December 15, 2000, Muncy moved to amend its answer and counterclaim to add a dispute regarding the North Boundary Line as well as additional surface water drainage claims.[6] On December 18, 2000, Harlan filed a petition for relief from the October 12, 2000 restraining order.

On December 21, 2000, Banning prepared a land title survey ("2000 Banning land title survey") for Harlan. Appellant's App. at 262. The 2000 Banning land title survey showed the West Boundary Line as further east than was previously shown on the 2000 Banning site plan, the 1996 Lewis site plan, and the Plot Diagram. *Id.* at 262, 260, 264, 234. The 2000 Banning land title survey indicated the North Boundary Line as running south of the North Storm Sewer and did not show the West Storm Sewer, which by then had been removed. *Id.* at 262. Neither the 2000 Banning boundary survey nor the 2000 Banning land title survey was based upon the measurements recorded in the relevant deeds. Tr. at 216–21, 697–99. Neither of these surveys was presented to local planning authorities or available to Muncy. *Id.* at 219–21, 416–21, 430, 638, 699; Appellant's App. at 260, 262.

On February 12, 2001, Harlan requested and received leave to add Banning as a third-party defendant. On April 27, 2001, Harlan withdrew its petition for relief from the restraining order. By that time, Harlan had installed curbing and blacktop over the disputed property line, thereby changing the elevation of Harlan's property and reversing the historical water flow. Tr. at 233, 553–60, 634–37.

In May 2001, Muncy filed a petition asking that Harlan be held in contempt for violating the October 12, 2000 order. Harlan filed a brief in which it asserted that the order did not comply with Indiana Trial Rule 65, that the order automatically expired ten days after entry, that it lacked sufficient specificity to be enforced through contempt, and that Muncy was equitably barred from enforcing it. Appellant's App. at 127–34. Four days after holding a hearing on the matter, the court issued a December 18, 2001 order finding Harlan in contempt for violating the October 12, 2000 restraining order. *Id.* at 36–41. That order also fined Harlan $500, awarded $1000 in attorney fees to Muncy, and further restrained Harlan "from any construction within 10 feet of the boundary line with Muncy until further order of this Court." *Id.* at 40.

A bench trial was held June 10, June 11, and September 9, 2004. Toward the end of the trial, the court dismissed the third-party complaint that Harlan had filed against Banning. On October 5, 2004, the court entered seventy-eight findings, twenty-six conclusions, and judgment, which stated *inter alia:*

> The location of the [West Boundary Line] is, as shown on the Drainage Plan[7], a parallel line Eighteen (18') from

---

6. Although the court did not grant the motion, the issues eventually were tried without objection.

7. *See* Appellant's App. at 260 (2000 Banning site plan).

the freezer building constructed for the Freezer Project.

The location of the [North Boundary Line] is, as shown on the drawings prepared [by] Lewis Engineering, Inc.[8], ... a line that runs through the center of an east to west running drain which divides the Muncy Real Estate on the north line of the Muncy Real Estate from the Harlan Real Estate on the south of the Harlan Real Estate.

That [Muncy is] hereby given judgment on their Counter–Claim against [Harlan] as follows:

| | | |
|---|---|---|
| 1. | Cost of removing concrete wall and replacing 15" corrugated drainpipe | $142,273.00 |
| 2. | Relocation of personal property | 5,235.00 |
| 3. | Loss of use of real estate | 14,600.00 |
| 4. | Damages pursuant to I.C. 34-24-3-1 | 25,000.00 |
| 5. | Fill for north end of property— 75 loads × $150.00 | 11,250.00 |
| 6. | Attorney fees to Lawrence R. Wheatley | 40,706.12 |
| | Total Judgment against Harlan | $239,082.12 |

All to earn interest at the rate of 8% per annum from the date of this judgment.

The court denies [Harlan's] Complaint.

Appellant's App. at 14–35.

## Discussion and Decision

### Standard of Review

Where, as here, the trial court made special findings of fact and conclusions of law, our review is two-tiered:

[W]e determine whether the evidence supports the trial court's findings, and we determine whether the findings support the judgment. We will not disturb the trial court's findings or judgment unless they are clearly erroneous. Findings of fact are clearly erroneous when the record lacks any reasonable inference from the evidence to support them, and the trial court's judgment is clearly erroneous if it is unsupported by the findings and the conclusions which rely upon those findings. In determining whether the findings or judgment are clearly erroneous, we consider only the evidence favorable to the judgment and all reasonable inferences to be drawn therefrom.

*Infinity Prods., Inc. v. Quandt,* 810 N.E.2d 1028, 1031 (Ind.2004). Harlan appeals from a negative judgment and therefore must

demonstrate that the trial court's judgment is contrary to law. A judgment is contrary to law only if the evidence in the record, along with all reasonable inferences, is without conflict and leads unerringly to a conclusion opposite that reached by the trial court. In conducting our review, we cannot reweigh the evidence or judge the credibility of any witness, and must affirm the trial court's decision if the record contains any supporting evidence or inferences.

*Id.* at 1032. "To the extent that the judgment is based on erroneous findings, those findings are superfluous and are not fatal to the judgment if the remaining valid findings and conclusions support the judgment." *Lasater v. Lasater,* 809 N.E.2d 380, 397 (Ind.Ct.App.2004).

### I. North Boundary Line

Harlan contends that the judgment erroneously reformed the North Boundary Line to be located on the North Storm Sewer. Further, Harlan claims that the court improperly relied upon parol evidence when it abandoned the Legal Description of the deed.

"In Indiana, a trial court is permitted to reform written documents only

8. *See* Appellant's App. at 264 (1996 Lewis site plan) and 234 (Plot Diagram circulated with Legal Description).

in cases in which one party mistakenly executed a document which did not express the true terms of the agreement, and the other party has acted under the same mistake, or has acted fraudulently or inequitably while having knowledge of the other party's mistake." *Lake Monroe Regional Waste Dist. v. Waicukauski*, 501 N.E.2d 466, 471 (Ind.Ct.App.1986) (holding that trial court "correctly concluded the parties intended to transfer the disputed lift station to District as part of the system, and the metes and bounds easement was prepared in error. The court's order reforming that document was correct, under the facts here presented."). "Similarly, a mistake by the scrivener will permit reformation of the instrument, wherein it is logically indicated that both parties were mistaken as to the actual contents of the instrument." *Id.*

Parol evidence has been explained as follows:

In general, where the parties to an agreement have reduced the agreement to a written document and have included an integration clause [9] that the written document embodies the complete agreement between the parties, ... the parol evidence rule prohibits courts from considering parol or extrinsic evidence for the purpose of varying or adding to the terms of the written contract. *However, the prohibition against the use of parol evidence is by no means complete. Indeed, parol evidence may be considered if it is not being offered to vary the terms of the written contract, and to show that fraud, intentional misrepresentation, or mistake entered into the formation of a contract.... In addition, parol evidence may be considered to apply the terms of a contract to its subject matter and to shed light upon the circumstances under which the parties entered into the written contract.*

*Krieg v. Hieber*, 802 N.E.2d 938, 943 (Ind. Ct.App.2004) (some citations omitted) (emphasis added).

Muncy consistently has not argued for reformation of the deeds. Indeed, its counsel stressed that Muncy was not "attacking a legal description," but was instead "trying to establish a boundary." Tr. at 364. Muncy did not offer and the court did not set forth a new legal description. Rather, the trial court applied the Legal Description to the land. Specifically, the court determined that the North Boundary Line, as described by the Legal Description and shown in the 1996 Lewis site plan and the Plot Diagram, bisected the North Storm Sewer. In addition to the 1996 Lewis site plan and the Plot Diagram, the court relied upon the testimonial evidence of Hugh Harlan and Kelly Muncy, as well as a letter from Attorney Hinkle, to support its determination of the physical location of the North Boundary Line. The challenged evidence was admitted to establish the physical location of the boundary line and not for the purpose of changing the written Legal Description contained in the relevant deeds.

The court was presented with the Banning site plan and the Banning surveys, which all indicated that the North Boundary Line was south of the North Storm Sewer. However, the court was free to consider that none of the Banning materials were legal [10] surveys, all were drafted

---

**9.** The final settlement agreement did contain an integration clause. *See* Appellant's App. at 155.

**10.** Harlan correctly notes that there is no requirement that to be used as evidence in a

court action to settle a boundary dispute, a survey must be a *legal* survey performed under Indiana Code Section 36–2–12–10. *See* Appellant's Br. at 22. However, this is not to say that the court may not accord a non-legal

after the February 12, 1999 transactions, and none were prepared pursuant to deeds of record. It was the court's task to weigh that evidence against the Lewis site plan, Plot Diagram, Hugh Harlan's testimony, Kelly's testimony, Attorney Hinkle's letter, and the absence of a contemporaneous legal survey, to determine the North Boundary Line.

■ We reiterate: "It is a familiar rule that it is not the office of a description to identify lands, but simply to furnish the means of identification." *Criss v. Johnson*, 169 Ind.App. 306, 311, 348 N.E.2d 63, 66 (1976). "Parol evidence is therefore often necessary to make descriptions intelligible." *Id.; see also Randolph v. Wolff*, 176 Ind.App. 94, 98, 374 N.E.2d 533, 536 (1978) ("It is well established that where the description given is consistent, but incomplete, and its completion does not require the contradiction or alteration of that given, nor that a new description should be introduced, parol evidence may be received to complete the description and identify the property."). Moreover, "we note that with respect to land descriptions, this court has held that the order of preference for the location of boundaries is in descending order as follows: natural objects or land marks, artificial monuments, adjacent boundaries, courses and distances, and lastly quantity." *Bowling v. Poole*, 756 N.E.2d 983, 989 (Ind.Ct.App.2001) (quotation marks omitted).[11]

While we might have weighed the evidence differently, we note the deferential standard of review applicable to negative judgments. In light of the evidence presented, we cannot say that the trial court

erred by determining that the North Boundary Line is "as shown on the drawings prepared [by] Lewis … a line that runs through the center of an east to west running drain which divides the Muncy Real Estate on the north line of the Muncy Real Estate from the Harlan Real Estate on the south of the Harlan Real Estate." Appellant's App. at 35.[12]

## II. West Boundary Line

■ Harlan next contends that the court erred by reforming the West Boundary Line to be a line eighteen feet from Harlan's building constructed in 2000. Harlan asserts that this conclusion lacks any support in the record. Harlan maintains that the eighteen-foot distance was from the proposed building to a proposed curb, rather than to the property line. Harlan also disputes the application of equitable estoppel, challenging both the agreement and the detrimental reliance elements.

Again, Muncy did not argue for reformation, was not attacking the Legal Description, and, in fact, offered no alternative legal description. Rather, Muncy was attempting to establish the physical location of the West Boundary Line relative to new improvements. The following evidence supported the court's determination of the physical location of the West Boundary Line: the 1996 Lewis site plan, the Plot Diagram, as well as the 2000 Banning site plan, which was presented to local authorities and was available for inspection. Each of these maps showed the West Storm Sewer on Muncy's parcel and running basically parallel to and slightly east of the West Boundary Line.

survey less weight—especially when created later in time—than a different survey.

11. While we acknowledge that a buried pipe is not the most convenient landmark or artificial monument, it can certainly be located.

12. To the extent that the court made conclusions regarding equitable estoppel and the North Boundary Line, they were superfluous.

In addition, there was evidence in the form of testimony and the 2000 Banning site plan that the distance between the proposed freezer building and the West Boundary Line was eighteen feet. There was also evidence that the eighteen-foot measurement was the distance to a curb.[13] The court heard testimony that there were setback concerns regarding the distance between the West Boundary Line and the proposed freezer building. Specifically, Hugh Harlan testified that Harlan "designed the project, had a cursory review that said it was fine so we went ahead and spent all the money on architectural prints" and took it to the Avon zoning authorities. Tr. at 139–41. Hugh Harlan believed that the setback changed, that it was for fire department purposes, and that a variance was received, but admitted that he did not handle it. *Id.* at 141.

Brian Haggard, of Banning, testified that the eighteen-foot measurement was from the freezer building to a curb, that the setback was supposed to be twenty feet, that the 2000 Banning site plan and the 2000 Banning boundary differed regarding the location of the West Storm Sewer by perhaps a foot and a half, and that the freezer would be two feet over the West Boundary Line (and therefore would not "fit") if the curb was the West Boundary Line. *Id.* at 125–26, 228–33. Muncy introduced an exhibit showing that the concrete wall erected by Harlan was twenty feet from the freezer building. Appellee's App. at 34. A photograph of the rebar, the new sewer, and the North Storm Sewer (before its removal) was also introduced. Appellant's App. at 257. The photo seems to show the West Storm Sewer to the east of the rebar. The court was also presented with evidence that Harlan had ignored the restraining order regarding the West Boundary Line. Tr. at 233, 553–60, 634–37 (evidence that Harlan had installed curbing and blacktop over disputed property line).

Certainly, there was evidence to the contrary. The 2000 Banning boundary survey and the 2000 Banning land title survey indicated that the West Boundary Line was further east than was previously shown on the 2000 Banning site plan, the 1996 Lewis site plan, and the Plot Diagram. However, as noted in the previous section of this opinion, there were reasons to question the Banning surveys—despite a muddy chronology of events. In any event, we are not at liberty to reweigh the evidence. Considering only the evidence favorable to the judgment and all reasonable inferences to be drawn therefrom, we cannot deem error the trial court's determination that the location of the West Boundary Line is, as shown in the 2000 Banning site plan, "a parallel line Eighteen Feet (18′) from the freezer building constructed for the Freezer Project." *See* Appellant's App. at 34. To the extent there were findings and conclusions regarding equitable estoppel, they were superfluous in that other evidence supported the court's determination of the West Boundary Line.

### III. *Damages Award*

Harlan challenges the award of damages, asserting that the findings and conclusions either were not supported by the evidence or did not exist. Harlan addresses each of the six parts of the damage award. Harlan also asserts that the court improperly awarded damages for a trespass claim that should not have been permitted to be added after trial.

■ First, Harlan cites the common enemy doctrine in disputing the court's

---

**13.** We are unclear as to how even if it were a measurement to the curb that such a fact would preclude it from also being a measurement to the West Boundary Line.

award of damages for improvements to the drainage system on Harlan's property. Harlan contends that it was entitled to make improvements to its property, including paving, changing the elevation, and installing a wall—regardless of what effect such improvements might have had upon Muncy's property's drainage.

■ Our supreme court has described the common enemy doctrine as follows:

> In its most simplistic and pure form the rule known as the "common enemy doctrine," declares that surface water which does not flow in defined channels is a common enemy and that each landowner may deal with it in such manner as best suits his own convenience. Such sanctioned dealings include walling it out, walling it in and diverting or accelerating its flow by any means whatever.

*Argyelan v. Haviland*, 435 N.E.2d 973, 975 (Ind.1982). "Thus, under the common enemy doctrine of water diversion, it is not unlawful for a landowner to improve his land in such a manner as to accelerate or increase the flow of surface water by limiting or eliminating ground absorption or by changing the grade of the land." *Luhnow v. Horn*, 760 N.E.2d 621, 631 (Ind.Ct.App. 2001). "The right to so improve one's land is not altered even where the land is so situated to the land of an adjoining owner that the improvement will cause water either to stand in unusual quantities on adjacent lands or to pass into or over adjacent lands in greater quantities or in other directions than the waters were accustomed to flow." *Trowbridge v. Torabi*, 693 N.E.2d 622, 626 (Ind.Ct.App.1998), *trans. denied.* Moreover, "[t]he common enemy doctrine applies regardless of the form of action brought by the plaintiff, that is, regardless of whether the plaintiff asserts his claims as an action for negligence, trespass, or nuisance." *Bulldog Battery Corp.*

*v. Pica Invs., Inc.,* 736 N.E.2d 333, 339 (Ind.Ct.App.2000). Indeed, the only limitation on the common enemy doctrine that has thus far been recognized is that "one may not collect or concentrate surface water and cast it, in a body, upon his neighbor." *Argyelan,* 435 N.E.2d at 976.

■ While we agree that Harlan could erect a wall on its property, pave its property, and raise the elevation of its property, the court here found that Harlan ventured beyond its property. The court found that Harlan built the wall on *Muncy's* property. The common enemy doctrine applies to landowners making improvements to their own land, not to landowners making improvements upon a neighbor's land.

■ Second, Harlan asserts that Hendricks County was the dominant estate owner of the easement for installation and maintenance of a storm sewer on servient estate owner Muncy's property. Thus, Harlan maintains, Hendricks County had the right to direct removal of the West Storm Sewer without notice to or the consent of Muncy.

■ "An easement is merely the right to use the land of another." *King v. Wiley,* 785 N.E.2d 1102, 1108 (Ind.Ct.App. 2003), *trans. denied.* "All rights necessarily incident to the enjoyment of the easement are possessed by the owner of the dominant estate, and it is the duty of the servient owner to permit the dominant owner to enjoy his easement without interference." *Panhandle E. Pipe Line Co. v. Tishner,* 699 N.E.2d 731, 739 (Ind.Ct.App. 1998). Absent an agreement to the contrary, "[t]he owner of the servient estate may use his property in any manner and for any purpose consistent with the enjoyment of the easement, and the dominant estate cannot interfere with the use." *Id;* see also *Bd. of Comm'rs of Vanderburgh*

*County v. Joeckel,* 407 N.E.2d 274, 277 (Ind.Ct.App.1980). Further, "[a]n easement cannot be changed to subject the servient estate to a greater burden than was originally agreed upon without the consent of the owner of the servient estate." *Brock v. B & M Moster Farms, Inc.,* 481 N.E.2d 1106, 1109 (Ind.Ct.App. 1985); *see also Brown v. Heidersbach,* 172 Ind.App. 434, 438, 360 N.E.2d 614, 618 (1977) ("titleholder of the dominant estate cannot subject the servient estate to extra burdens any more than the holder of the servient estate can materially impair or unreasonably interfere with the use of the easement") (citation omitted); *see Corp. for Gen'l Trade v. Sears,* 780 N.E.2d 405, 413 (Ind.Ct.App.2002).

Muncy's use of the West Storm Sewer pipe for drainage did not interfere with and was consistent with Hendricks County's drainage goals. Indeed, Hendricks County tried to protect Muncy's drainage use when it stated, "be certain no sub surface drainage has been blocked. Any drains found when the pipe is removed are to be connected to the new storm drainage system." Appellant's App. at 56. Yet, the result of Hendricks County's assent to the removal of the West Storm Sewer was to subject Muncy to extra burdens.

There was evidence to support the conclusion that the pipe was more like a private drain than a regulated drain, as it was owned by one or more persons and was not established under a drainage statute. *See* Ind.Code § 36–9–27–2. While according to Indiana Code Section 36–9–27–16(a), private drains are generally exempt from the provisions of Indiana Code Chapter 36–9–27, an exception exists for private drains that are converted into regulated drains. *See* Ind.Code § 36–9–27–19. Here, Harlan removed the West Storm Sewer pipe and installed a new storm sewer pipe, and some evidence indicated it then became a regulated drain. Tr. at 261–67, 442–43; Appellant's App. at 223–25. As such, we cannot deem as error the conclusion that Harlan[14] should have met the statutory requirements of notice and hearing. *See* Ind.Code § 36–9–27–19.

■ We do, however, find error in the conclusion that "Harlan unlawfully and in violation of a Temporary Restraining Order removed the Private Drain." Appellant's App. at 29 (conclusion # 5). As Harlan correctly points out (Appellant's Br. at 39), Harlan removed the West Storm Sewer (and erected the concrete wall) before the October 12, 2000 hearing and while the September 26, 2000 temporary restraining order *permitting its removal* was in effect. *See* Tr. at 8 (Muncy's counsel's statement during October 12, 2000 hearing); *see also id.* at 556–60 (cross-examination of Kelly Muncy).

■ Third, we turn to Harlan's challenges to each line of the damage award. Before we delve into each line, we acknowledge:

The computation of damages is strictly a matter within the trial court's discretion. No degree of mathematical certainty is required in awarding damages as long as the amount awarded is supported by evidence in the record; however, an award may not be based upon mere conjecture, speculation, or guesswork. In property damage actions, the appropriate measure of damages is the difference between the fair market value of the property prior to and after the inju-

---

14. Muncy alleges that Hendricks County "ignored" the requirements for a private drain-converted-to-a-regulated drain. Appellees' Br. at 32–33. Given that Hendricks County was apparently unaware of the boundary dispute, we are not inclined to suggest that it actively or purposely hid its actions from Muncy.

ry where the injury is permanent. To support an award of compensatory damages, facts must exist and be shown by the evidence which afford a legal basis for measuring the plaintiff's loss. To that end the damages must be referenced to some fairly definitive standard, such as market value, established experience, or direct inference from known circumstances.

*Romine v. Gagle,* 782 N.E.2d 369, 382–83 (Ind.Ct.App.2003), *trans. denied.* Stated otherwise, we "will not disturb an award for damages when the amount is within the bounds of the probative evidence adduced at trial." *Beyer v. State,* 258 Ind. 227, 236, 280 N.E.2d 604, 610 (1972).

### Line 1. Cost of removing concrete wall and replacing 15″ corrugated drainpipe . . . $142,273.00

■ In addressing this line, we note,

There are doubtless many formulas and principles which experts use in this field or any other to arrive at their ultimate opinions. The determination of which factors, formulas or calculations are necessary, either singly or in conjunction with each other, to form an expert opinion is within the knowledge and judgment of the expert and, again, is a subject which can be approached and examined in the cross-examination or by bringing forward other expert witnesses.

*Martin v. Roberts,* 464 N.E.2d 896, 900–01 (Ind.1984).

■ To prove its damages, Muncy called Donald Groninger as a witness. Tr. at 653–84. In providing an estimate of damages, Groninger relied upon his fifty-plus years of experience in the field of excavation in the Avon area, his company's comptroller's calculations, and Muncy's description of what it needed to compensate it for Harlan's actions. Harlan cross-examined Groninger and highlighted many of the same arguments it now makes on appeal. Harlan did not call its own witness to contradict Groninger's numbers. The trial court heard Harlan's challenges to Groninger's testimony and accompanying exhibit (Appellant's App. at 258). While we will not second-guess the trial court's determination of damages where some evidentiary support exists, we are unable to reconcile certain portions of the order.

The trial court determined that the West Boundary Line was eighteen feet from the freezer building, that Harlan installed its concrete wall "on the Muncy side of the" West Boundary Line, and that the wall "will either actually or potentially further prevent and/or impede the drainage of excess water from the Muncy Property." *Id.* at 30–31, 34, 25. As noted *supra,* Line 1 of the court's calculation of damages sets out $142,273.00 for "removing concrete wall and replacing 15" corrugated drainpipe." Presumably, the court relied upon Groninger's written estimate, which contains a "grand total" of $142,273.00. However, the Groninger estimate includes unspecified costs for removing the concrete wall as well as for constructing a new wall "on your [Muncy's] side." *See id.* at 258. This is problematic for various reasons. First, the language in Line 1 of the court's calculation does not seem to require construction of a new wall. Second, according to the court's determination of the West Boundary Line, the wall is *already* on Muncy's side of the West Boundary Line. Thus, to require the removal of the current wall on Muncy's property and then the installation of a new wall on Muncy's property is perplexing. Third, construction of a new wall would seem to be inconsistent with the conclusion that the wall creates drainage problems for Muncy. It is conceivable that Muncy would prefer some other type of wall, but

we have not been provided with evidence to that effect. Moreover, to the extent that a new wall is inappropriate, Groninger's estimate is not sufficiently detailed to permit a simple excision of the amount awarded for construction of a new wall.

### Line 2. Relocation of personal property ... $5,235.00

We reiterate: no degree of mathematical certainty is required in awarding damages as long as the amount awarded is supported by evidence in the record. During his testimony, Kelly discussed how he incurred moving costs and anticipated that he would have to incur future moving costs due to Harlan's activities. Tr. at 490–95. An exhibit summarizing these estimates, and containing a total of $5,235.00, was received into evidence. Appellant's App. at 256. Harlan had the opportunity to cross-examine Kelly regarding the figures. For the most part, Harlan's dispute on appeal goes to the weight to be accorded to the evidence presented, and we may not intrude on the court's determination in this regard.[15] However, to the extent that the estimate concerns installation of a new retaining wall(s), we see some merit to Harlan's argument.

### Line 3. Loss of use of real estate ... $14,600.00

In addressing Harlan's challenge to Line 3, we again recognize the appropriate deferential standard for reviewing damage awards. *See Romine*, 782 N.E.2d at 382–83. The court found that Muncy alleged a reasonable value for the loss of use of its real estate was $50 per day from September 26, 2000, the date Harlan received its temporary restraining order, through October 5, 2004, the date of judgment. *See* Appellant's App. at 27. In-

deed, Kelly testified that he would value the loss of use of real estate at $50 per day. Tr. at 542. Again, Harlan was given the opportunity to cross-examine. The court evidently weighed Kelly's testimony against other evidence presented, candidly admitted the difficulty of computing loss of use damages, and reduced the daily loss of use by 80%—to $10. On appeal, we are unwilling to reweigh the court's determination. We also note Harlan's fortune that the court did not blindly accept Kelly's estimate.

### Line 5, Fill for north end of property— 75 loads × $150.00 ... $11,250.00

Harlan notes that the court found that Kelly "testified that it will take at least 75 truckloads of fill to raise that part of the Muncy Real Estate to the same level as the Harlan Real Estate. He estimates that the fill will cost from $150.00 to $250.00 per truckload." Appellant's App. at 27 (finding # 68). Apparently relying upon finding # 68, and again taking a conservative approach to damages, the court in Line 5 awarded $11,250.00 for: "Fill for north end of property—75 loads × $150.00." *Id.* at 35. However, Harlan notes that Line 1 of the award relied upon Groninger's written estimate totaling $142,273.00, which included a line item for "110′ × 75′ × 3′ Stone area" but no exact amount. Appellant's Br. at 47; Appellant's App. at 258. Harlan asserts that this line "item represents the cost to fill an average of 3 feet deep, the entire width of Muncy's property for a length of 75 feet from the north end" and therefore is duplicative of Line 5. Appellant's Br. at 47; Tr. at 679–80. Muncy does not respond to this argument, and we have found no evi-

---

15. We point out that the exhibit lists "Estimated storage during repairs: Yet to be determined[,]" which would seem to indicate that the amount is too low. Appellant's App. at 256.

dence to demonstrate that Harlan is not being made to pay twice in this regard.

### Lines 4 and 6, Criminal Trespass and Conversion

█ Finding that Harlan committed conversion of Muncy's property and that Harlan trespassed, the court found that Muncy was entitled to "(a) An amount not to exceed three (3) times actual damages; (b) The cost of this action; [and] (c) Reasonable attorney's fees...." Appellant's App. at 32 (citing Ind.Code § 34–24–3–1). Line 4 of the judgment awards $25,000 for "Damages pursuant to I.C. 34–24–3–1." Appellant's App. at 34. Line 6 awards $40,706.12 for "Attorney fees to Lawrence R. Wheatley." *Id.* at 35. Challenging both of these lines, Harlan asserts that (1) the court should have denied Muncy's motion to add a claim of criminal trespass because Harlan was without notice that trespass was an issue being tried; and (2) Harlan cannot be liable for either criminal trespass or criminal conversion. Conversely, Muncy, on cross-appeal, challenges the adequacy of the $25,000 treble damages award. Even assuming that the trial court should not have permitted the addition of the criminal trespass claim, we conclude that treble damages and attorney fees were appropriate for the conversion claim.

█ The Victim's Relief Act, Indiana Code Section 34–24–3–1,

permits a person who suffers a pecuniary loss as a result of a violation of I.C. § 35–43–4–3, criminal conversion, to recover treble damages and attorneys' fees. The statute defines criminal conversion as: "[a] person who knowingly or intentionally exerts unauthorized control over the property of another person commits criminal conversion, a Class A misdemeanor." I.C. § 35–43–4–3. "To exert control over property" is defined

by statute as "to obtain, take, carry, drive, lead away, conceal, abandon, sell, convey, encumber, or possess property or to secure, transfer, or extend a right to property." I.C. § 35–43–4–1. A criminal conviction is not a prerequisite for bringing this civil action. And unlike a criminal trial, a claimant need only prove by a preponderance of the evidence that the criminal act was committed by the defendant.

*N. Elec. Co. v. Torma,* 819 N.E.2d 417, 429 (Ind.Ct.App.2004) (some citations omitted), *trans. denied.* "[T]he award of damages above the actual damages is within the discretion of the trial court." *MCS Laser-Tec, Inc. v. Kaminski,* 829 N.E.2d 29, 35 (Ind.Ct.App.2005). "An abuse of discretion will be found when the trial court's action is against the logic and effect of the facts and circumstances before it and the inferences which may be drawn therefrom." *City of Carmel v. Leeper Elec. Servs., Inc.,* 805 N.E.2d 389, 392 (Ind.Ct. App.2004), *trans. denied.*

Harlan maintains that the court erroneously determined that the West Storm Sewer was Muncy's property rather than the property of Hendricks County. Harlan also maintains that the court erroneously concluded that Harlan's actions, which impaired drainage to Muncy's property, contributed to a "wrongful taking" because this conclusion contravenes the common enemy doctrine. Having already addressed both of these issues and decided them adversely to Harlan, we conclude that an award of treble damages for conversion was appropriate. As for the amount, we are unmoved by Muncy's contentions on cross-appeal. The court was made aware of Muncy's allegations regarding Harlan's actions. While pursuant to Indiana Code Section 34–24–3–1, the court could have awarded more, we cannot say that the court abused its discretion in de-

termining that $25,000 was an adequate amount of damages in light of the evidence presented. For the same reason we conclude that treble damages were appropriate for conversion, we likewise conclude that attorney fees were properly awarded. Harlan does not argue, and thus we need not address, the reasonableness of the amount of attorney fees awarded.

To the extent that Muncy, on cross-appeal, is requesting additional damages and/or fees pursuant to Appellate Rule 66(E), we deny this request. Under Appellate Rule 66(E), "[t]he Court may assess damages if an appeal, petition, or motion, or response, is frivolous or in bad faith." "A strong showing is required to justify an award of appellate damages, and the sanction is not imposed to punish mere lack of merit, but something more egregious." *Manous v. Manousogianakis*, 824 N.E.2d 756, 767–68 (Ind.Ct.App.2005). Harlan's appeal is sufficiently meritorious to preclude an award of appellate fees pursuant to Appellate Rule 66(E).

A related issue that we must address is Muncy's cross-appeal request for prejudgment interest. When reviewing a decision regarding prejudgment interest,

> we review for an abuse of discretion. "We note that the crucial factor in determining whether damages in the form of prejudgment interest are allowable is whether the damages were ascertainable in accordance with fixed rules of evidence and accepted standards of valuation. An award of prejudgment interest is proper only where a simple mathematical computation is required." ... ("Damages are readily ascertainable where the trier of fact need not exercise its judgment to assess the amount of damages."); *Firstmark Standard Life*

*Ins. Co. v. Goss*, 699 N.E.2d 689, 693 (Ind.Ct.App.1998) ("An award of prejudgment interest in a contract claim is warranted if the terms of the contract make the claim ascertainable and the amount of the claim rests on mere mathematical computation."), *trans. denied.* *Thor Elec., Inc. v. Oberle & Assocs., Inc.*, 741 N.E.2d 373, 373 (Ind.Ct.App.2000) (some citations omitted).

As should be evident from our conclusions *supra*, this was not a case where the damages were readily ascertainable in accordance with fixed rules of evidence and/or accepted standards of valuation. More than mere mathematical computation was necessary. The treble damages were discretionary and thus not readily ascertainable. Moreover, the errors in computation further illustrate the lack of easy ascertainment of the damages in this case. Accordingly, this is not the type of situation wherein prejudgment interest is proper, and we decline Muncy's offer to remand this matter to grant prejudgment interest.

### IV. Contempt

Lastly, Harlan contends that the court erroneously held it in contempt of the October 12, 2000 restraining order. Harlan notes that Muncy's counsel orally requested a counter-restraining order. Harlan faults the court for granting Muncy's request without notice to Harlan, without a verified written request from Muncy, without evidence, without a bond, and without scheduling a preliminary hearing within ten days. Appellant's Br. at 48. In addition, Harlan asserts that the court's restraining order was too vague and indefinite and that Harlan's payment of the $500 fine and $1,000 in attorney fees should not preclude [16] its appeal of the matter.

Indiana Trial Rule 65(B) provides:

---

16. Muncy does not seem to argue, hence we

do not address, whether Harlan's payment of

A temporary restraining order may be granted without written or oral notice to the adverse party or his attorney only if:

(1) it clearly appears from specific facts shown by affidavit or by the verified complaint that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or his attorney can be heard in opposition; and

(2) the applicant's attorney certifies to the court in writing the efforts, if any, which have been made to give notice and the reasons supporting his claim that notice should not be required.

Every temporary restraining order granted without notice shall be indorsed with the date and hour of issuance; shall be filed forthwith in the clerk's office and entered of record; shall define the injury and state why it is irreparable and why the order was granted without notice; and shall expire by its terms within such time after entry, not to exceed ten [10] days, as the court fixes, unless within the time so fixed the order, for good cause shown, is extended for a like period or unless the whereabouts of the party against whom the order is granted is unknown and cannot be determined by reasonable diligence or unless the party against whom the order is directed consents that it may be extended for a longer period. The reasons for the extension shall be entered of record. In case a temporary restraining order is granted without notice, the motion for a preliminary injunction shall be set down for hearing at the earliest possible time and takes precedence of all matters except older matters of the same character; and when the motion comes on for hearing the party who obtained the temporary restraining order shall proceed with the application for a preliminary injunction and, if he does not do so, the court shall dissolve the temporary restraining order. On two (2) days' notice to the party who obtained the temporary restraining order without notice or on such shorter notice to that party as the court may prescribe, the adverse party may appear and move its dissolution or modification and in that event the court shall proceed to hear and determine such motion as expeditiously as the ends of justice require.

Indiana Trial Rule 65(C) states:

No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained. No such security shall be required of a governmental organization, but such governmental organization shall be responsible for costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.

 Harlan is technically correct that the court granted Muncy's request without notice to Harlan. However, had Harlan appeared at the October 12, 2000 hearing, as it was supposed to for a hearing on its own motion for preliminary injunction, notice would have occurred. Moreover, Harlan could not have been surprised by the restraining order since it was clearly aware of the boundary dispute.[17] While we do not condone the lack of

the fine and attorney fees waived its challenge to the contempt finding. We do, however, commend Harlan for its prompt compliance with the payment order.

17. Apparently, the boundary dispute was so

affidavit or verified complaint, nonexistent bond, or the failure to schedule a preliminary hearing within ten [18] days, Harlan did not object to these irregularities until now.[19] It is axiomatic that an issue cannot be raised for the first time on appeal. *City of Gary v. Belovich,* 504 N.E.2d 286, 288 (Ind.Ct.App.1987). As such, Harlan has waived these issues.

▋ In addressing Harlan's assertions of vagueness and indefiniteness, we note that whether a person is in contempt is a matter left to the trial court's discretion. *Mitchell v. Mitchell,* 785 N.E.2d 1194, 1198 (Ind.Ct.App.2003). We will reverse a finding of contempt only where an abuse of discretion has been shown, which occurs only when a trial court's decision is against the logic and effect of the facts and circumstances before it. *Id.* "The trial court must find 'willful disobedience' to hold a party in contempt for violation of court orders." *In re Marriage of Glendenning,* 684 N.E.2d 1175, 1179 (Ind.Ct. App.1997), *trans. denied.* The order allegedly violated must have been so clear and certain that there could be no question as to what a party must do, or not do, and so there could be no question regarding when the order is violated. *Ind. High School Athletic Ass'n v. Martin,* 765 N.E.2d 1238, 1241 (Ind.2002). "A party may not be held in contempt for failing to comply with an ambiguous or indefinite order." *Martin v. Martin,* 771 N.E.2d 650, 654 (Ind.Ct.App. 2002).

Here, Harlan was ordered to halt "any further work on this matter until a full hearing can be held." Appellant's App. at 42; Tr. at 8, 10. While in a vacuum this might have been vague and/or indefinite, this particular order came on the heels of the court's granting and dissolving of Harlan's September 26, 2000 restraining order which had required Muncy to remove property from Harlan's side, refrain from interfering with the freezer project, and permit removal of the West Storm Sewer pipe. The orders related to the same matter, i.e., the boundary dispute. As such, we view Harlan's contention, that it was unclear on the meaning of the order, to be rather disingenuous. Further, had Harlan truly been uncertain, clarification should have been sought before Harlan installed curbing and blacktop over the disputed property line, thereby changing the elevation of Harlan's property and reversing the historical water flow. *See* Tr. at 233, 533–60, 634–37. We cannot say that the court's contempt finding was against the logic and effect of the facts and circumstances before it. Hence, we will not reverse the contempt finding or the accompanying fine and award of attorney fees.

### Conclusion

In summary, Harlan has not overcome the stringent negative judgment standard as to the trial court's determinations of the physical location of the North Boundary

---

heated that Harlan had armed guards wearing bullet-proof vests on the job site sometime between the September 26 order and the October 12 order. Tr. at 535–37.

18. We disagree with any implication (Appellant's App. at 127–34) that the October 12, 2000 order automatically expired after ten days; by the order's express language, it did not expire "until a full hearing can be held." Appellant's App. at 42; Tr. at 8, 10. It was erroneous to allow for such an indefinite duration, but we do not believe it rendered the

order "void." *See Bowyer v. Ind. Dep't of Natural Res.,* 798 N.E.2d 912, 918 n. 4 (Ind. Ct.App.2003).

19. On December 18, 2000, Harlan did file its Petition for Relief from Temporary Restraining Order. However, that petition raised safety issues that Harlan argued necessitated relief from the restraining order so that it could backfill certain excavated areas; the petition raised no issues as to Trial Rule 65.

Line and the West Boundary Line. However, we do find error in conclusion #5 ("Harlan unlawfully and in violation of a Temporary Restraining Order removed the Private Drain"). Of additional concern is the portion of damages related to the installation of a new wall (see discussion of Lines 1 and 2) and the apparent double recovery for fill (see Line 5 discussion). As for Muncy's cross-appeal, we deny its request for Appellate Rule 66(E) damages and/or fees as well as for prejudgment interest. Finally, we see no abuse of discretion in the court's finding of contempt and accompanying order for payment of a $500 fine and $1000 in attorney fees. Accordingly, we affirm the majority of the judgment, but reverse in part and remand for a hearing and reconsideration of damages in light of our opinion.

Affirmed in part, reversed in part, and remanded.

DARDEN, J., and MATHIAS, J., concur.