**PORTSIDE ENERGY CORPORATION, INC., Appellant–Plaintiff,**

**v.**

**NORTHERN INDIANA COMMUTER TRANSPORTATION DISTRICT, Appellee–Defendant.**

No. 64A04–0902–CV–74.

Court of Appeals of Indiana.

Sept. 2, 2009.

Paul A. Rake, Robert J. Feldt, Eichhorn & Eichhorn, LLP, Hammond, IN, Attorneys for Appellant.

Michael C. Harris, Harris Welsh & Lukmann, Chesterton, IN, Attorney for Appellee.

## OPINION

BAKER, Chief Judge.

Appellant-plaintiff Portside Energy Corporation (Portside) appeals the trial court's grant of summary judgment in favor of appellee-defendant Northern Indiana Commuter Transportation District (NICTD), in which the trial court denied Portside's request for a declaratory judgment. Specifically, Portside argues that the trial court erred in determining that an indemnification agreement between Portside and NICTD was enforceable as a matter of law. Portside also maintains that the trial court erred in ordering it to pay NICTD's attorneys fees and interest on the amount that it allegedly owed NICTD. Concluding that the trial court properly granted NICTD's motion for summary judgment, we affirm.

### FACTS

NICTD, a municipal corporation, operates a commuter passenger train in northern Indiana. Sometime in 1959, the National Steel Company (National Steel) obtained a license to create and cross a private grade crossing of the Chicago South Shore and South Bend Railroad (the South Shore) tracks adjacent to U.S. Highway 12 in what eventually became Portage, Indiana. The license was for the purpose of ingress and egress to and from National Steel's finishing plant that was located just north of those tracks. NICTD currently owns the South Shore tracks.

National Steel also had to obtain a similar private grade crossing of what was known as the New York Central Railroad (New York Central), which lay north of the South Shore Railroad. In June 1998, Conrail owned the New York Central tracks, and Norfolk Southern currently owns them. The road and the two sets of tracks it crossed later became known as the Midwest Crossing.

Sometime in 1965, New York Central relocated its tracks at the Midwest Crossing to the extent that a 138–foot gap between the two railroads' gates was reduced to 58 feet. Traffic across Midwest Crossing was limited to those doing business with the various businesses located on the northern side of the tracks and was controlled by flashing lights and crossing gates.

Each railroad operates its own crossing, signals, and gate system independently of the other, except that each railroad alerts the other of that railroad's approaching trains. There are gates, flashers, and a bell at each railroad crossing. Conrail has

two gates, one on each side of its tracks, and NICTD has two gates, which are also located on each side of its tracks. NICTD operates its gates and signals system to ensure compliance with federal requirements for any of its train movements at or near its crossing.

On November 17, 1995, Sequa Coatings Corporation (Sequa), a company that applies coatings to coiled steel and aluminum, was interested in building a steel coating facility north of the two railroads. To do so, it required access over the Midwest Crossing and the two railroads. After engaging in lengthy negotiations, Sequa executed an agreement with NICTD that permitted Sequa employees, visitors, customers, and suppliers to cross NICTD's tracks. Under the agreement, Sequa was permitted to use and was required to maintain the Midwest Crossing. A separate licensing agreement was negotiated with regard to crossing the Conrail Tracks.

On December 12, 1997, Portside desired to operate a gas-fired electric generating plant to provide electricity to Midwest and the Northern Indiana Public Service Company (NIPSCO) grid. Portside negotiated an agreement with NICTD similar to the Sequa Agreement so as to give it a license to cross NICTD's Tracks. This agreement was exactly the same as the Sequa Agreement with regard to the indemnification provisions. Portside also negotiated a separate license agreement with Conrail to cross the Conrail Tracks.

The indemnification provisions set forth in the agreement provided in part that

(a) It is understood by all parties that Licensors' operations at or near the Crossings and other property associated with this Agreement involve some risk, and Portside as part of the consideration for this Agreement releases and waives any right to ask for or demand damages from any Licensor party for or on account of the loss of or damage to the Crossing, including the loss of or interference with service or use of the Crossing and irrespective of whether such loss or interference is attributable to the fault, failure or negligence of any of the Licensor parties.

(b) The phrase "Loss or Damage" as used within this Agreement shall be interpreted by the parties to include any and all loss of, damage to, or destruction of any real property, personal property, or environment, including without limitation, damage to or destruction of land, air, water, wildlife, or vegetation, and irrespective of whether the damaged or destroyed property is owned or otherwise possessed by the Licensors, Licensee, or a third party, and injury to or death of any person or persons whomsoever, including, without limitation, the parties to this Agreement, their agents, employees, customers, visitors, suppliers, and any and all non parties who use, occupy, or otherwise utilize the assets associated with, or participate in the activities arising out of, this Agreement.

(c) The phrase "Claims, Settlements, Litigation, and Related Expenses" shall include any and all losses, damages, costs, payments, and expenses of every kind and nature, including reasonable attorney fees and disbursements, incurred by or attributable to any Licensor party, other railroad parties lawfully utilizing the Crossing, and their respective agents, subcontractors, successors, officers, and assigns as a result of claims, demands, actions, suits, proceedings, judgments or settlements arising out of, in whole or in part, or in any way connected with the Crossing, the subject matter of any indemnity provision of this Agreement, or the activities

of Licensee, its agents and its subcontractors at or near said Crossing.

(d) The phrase "Causes of Action" shall include all claims, settlements, litigation, and related matters associated with or arising under this Agreement, whether rightfully or wrongfully made, to include, but not limited to, Claims, Settlements, Litigation, and Related Expenses associated with and Loss or Damage arising from the construction, operation, maintenance, use and removal of any assets associated with the Crossing, this Agreement, or the property authorized for use by this Agreement, as well as matters associated with or arising under various workers compensation laws, the Indiana Tort Claims Act, the Federal Employees Liability Act, various federal and state environmental statutes, and any other federal or state laws or regulations applicable to the construction, operation, maintenance, use, and removal of any assets associated with this Agreement including, but not limited to, the Crossing. The foregoing examples are only partially illustrative of the types of Causes of action contemplated for coverage by this Agreement, it being the parties' mutual intent to include within the scope of the indemnification afforded under this Agreement a full, complete, comprehensive and unconditional grant of indemnity from Licensee to the Licensor parties with respect to any and all potential exposures risked by the Licensor parties resulting from or arising out of this Agreement.

. . .

(f) The Licensee shall hold harmless, defend, and indemnify the Licensor parties, other railroad parties lawfully using the Crossing, and the Licensor parties' agents, employees, officials, and governing boards from any and all Causes of Action, as defined above, asserted by any parties and non-parties to this Agreement, including, but not limited to, any Causes of Action for Loss or Damage due to negligence, misconduct, malfeasance, or misfeasance by any Licensor party or parties resulting from or arising out of any aspect of any Licensor party's participation in this Agreement, include[ing], but not limited to, any Cause of Action, in any way related to or associated with, or on account of, the construction, placement, attachment, presence, use, maintenance, repair, alteration, renewal, or relocation, of the Crossing, whether such Loss or Damage be suffered or sustained by the Licensor parties directly, by their employees and patrons, or any other persons or corporations, including, but not limited to, Portside, its employees, contractors, subcontractors, agents, visitors, customers, or suppliers who may seek to hold any Licensor party liable, and irrespective of whether said Causes of Action are caused by or resulting from, in whole or in part, the activities of any Licensor party, other railroad parties lawfully using the Crossing, or their respective agents, directors, employees, officials, or governing boards. Said defense and indemnification shall include, and is not limited to, reimbursement of any Licensor party for its Claims, Settlements, Litigation, and Related Expenses, which may be imposed upon, incurred by, or asserted against any Licensor party or for which any Licensor party may be held or become liable.

Appellant's App. p. 124–26.

On June 17, 1998, truck driver Keith Lintz was delivering three steel coils to Sequa. Lintz had loaded two coils onto the first trailer and one coil onto the second trailer. The coil on the second trailer was secured to the trailer by a single chain. At approximately 4:30 a.m., Lintz

arrived in Portage and turned from U.S. Route 12 onto National Steel's private road and across NICTD's tracks.

Lintz was forced to stop at Comail's crossing because the gates came down for an approaching Conrail train. The fifty-eight foot area between the two sets of tracks was insufficient to allow the eighty-two foot long truck and trailer combination to clear NICTD's railroad tracks and the second trailer remained stopped on the railroad tracks. While Lintz waited for the train on Comail's tracks to pass, he observed NICTD's railroad crossing gate descend. The warning lights also began to flash. Aware that a NICTD train was approaching, Lintz attempted to turn the truck to the left and off the tracks. However, Lintz was unable to move the truck from the tracks, and the NICTD train struck the second trailer.

The second trailer broke away from the first trailer upon impact and was pushed by the front of the train. The steel coil on the second trailer broke, allowing the nineteen-ton coil to enter the train and move to the passenger compartment. As a result, three people were killed and several others were injured.

After the accident, the National Transportation Safety Board (NTSB) found that the primary cause of the accident was the faulty design and operation of the two crossings owned by NICTD and Conrail/Norfolk. Subsequent investigations determined that NICTD knew of the dangerous unsafe crossing design in light of prior "near misses" that had occurred. It was also determined that NICTD is responsible for its gates, who enters the crossing, the warning lights, and whether its trains proceed through the crossing according to the standards prescribed by the Federal Rail Administration (FRA). There was no gate warning system for the train operators and there were no lights or reflectors to indicate that someone might be trapped behind the NICTD gates or waiting behind the adjacent gates.

On October 29, 1999, the decedents' estates filed their initial complaints. Three wrongful death actions were filed along with a class action suit. Thereafter, NICTD filed a cross-claim against the trucking defendants for damages to one of its cars and other property, and a cross-claim against Sequa for indemnification. NICTD subsequently filed a motion for summary judgment regarding the enforceability and validity of their license agreement. Sequa filed a cross-motion for summary judgment and, following a hearing on those motions, the trial court granted summary judgment in favor of NICTD.

All claims were joined for discovery and trial. A number of defendants were named in the plaintiffs' complaint, including Sequa, National Steel, NICTD and Conrail, and the lessee, driver, and owner of the trucking company. A settlement agreement was reached, and each defendant shared a portion of the responsibility for the plaintiffs' injuries and damages. NICTD also recovered $350,000 for the damages to its car from the trucking defendants.

On January 31, 2002, Portside sought a declaratory judgment that it was not liable for damages stemming from the accident at the crossing. NICTD counterclaimed against Portside, alleging that Portside was liable pursuant to the indemnification agreement. However, NICTD elected to hold its claim in abeyance pending the resolution of its cross-claim against Sequa under the indemnification provisions of the agreement with Sequa.

By the end of 2003, the underlying tort claims were settled as to Conrail/Norfolk. Sequa appealed to this court, arguing that the trial court had erred in enforcing the

indemnification agreement and holding it liable for NICTD's damages. The settlement agreement provided that if this court affirmed the trial court's decision, and after exhausting all appeal rights, NICTD and Sequa would arbitrate the issue of NICTD's damages. The day after the settlement terms were reached, we affirmed the trial court's order, finding in favor of NICTD and against Sequa. *Sequa Coatings Corp. v. N. Ind. Commuter Transp. Dist.*, 796 N.E.2d 1216 (Ind.Ct.App.2003).[1]

On April 3, 2006, a panel of three arbitrators heard evidence regarding NICTD's total damages. NICTD established that the damage to its car totaled $1,126,825.71. NICTD then subtracted the $350,000 that was paid by the trucking companies, leaving a balance of $776,825.71. In accordance with a loan receipt, NICTD paid CIGNA Insurance Company a prorated share of its $350,000 settlement from the trucking companies. The payment was made long before the arbitration had commenced.

Thereafter, NICTD elected to turn to Portside for the balance of its loss of $221,630. On January 30, 2007, NICTD sent Portside a letter demanding payment in that amount. Portside refused to pay, and on January 22, 2008, NICTD filed its first amended counterclaim invoking the indemnification provisions of the agreement. NICTD requested $221,630 in unpaid damages to its car, plus interest from January 30, 2007, and attorneys fees.

Thereafter, NICTD filed a motion for summary judgment, claiming that Portside was obligated to pay those amounts as a matter of law in accordance with the indemnification provisions. In response, Portside filed a cross-motion for summary judgment, claiming that it was not bound by the indemnity provisions of the agree-

ment. Portside did not challenge the amount that NICTD claimed that it owed. Rather, Portside contended that the indemnification language set forth in the agreement absolved it of *any* liability for the damage that occurred to NICTD's train car.

Following a hearing, the trial court granted NICTD's motion for summary judgment and entered the following order on January 14, 2009:

There is a long history to this litigation which arose out of a collision on June 18, 1998 between a commuter train operated by Northern Indiana Commuter Transportation District (hereinafter referred to as NICTD) and a driver of a truck and two trailer combination that was stopped on a westbound track of NICTD at the Midwest Steel entrance in Portage, Indiana. As a result of the collision, a steel coil being hauled by the truck dislodged and entered the lead passenger car of NICTD causing significant damage to that car as well as injuries and death to three (3) NICTD passengers.

Thereafter, much litigation ensued which culminated in decisions by the State of Indiana Court of Appeals in *Northern Indiana Commuter Transportation District v. Sequa Coatings Corporation, et al.* . . .

There remains however, a legal determination as to the liability, if any, of Counter–Defendant, Portside Energy Corporation (hereinafter referred to as "PORTSIDE") to NICTD.

PORTSIDE desired to obtain permission from NICTD to use and maintain a previously constructed private grade crossing across NICTD's right of way in the town of Portage, Porter County, Indiana for the sole purpose of ingress

---

**1.** Our Supreme Court subsequently denied transfer in this case.

and egress by PORTSIDE's employees, visitors, construction contractors, customers and suppliers from U.S.: Highway Route 12. Negotiations ensued between NICTD and PORTSIDE culminating in a private crossing agreement of December 12, 1997. In that agreement, reciting mutual consideration, NICTD granted to PORTSIDE the right and privilege to use the aforementioned private roadway crossing. In Section 25(d), page 10 of said agreement, there was the provision, inter alia, that

> "... The foregoing examples are only partially illustrative of the types of Causes of Action contemplated for coverage by this Agreement, it being the parties' mutual intent to include within the scope of the indemnification afforded under this Agreement a full, complete, comprehensive and unconditional grant of indemnity from Licensee to the Licensor parties with restricted to any an (SIC) all potential exposures risked by the Licensor parties resulting from or rising out of this Agreement." (Emphasis added).

It is this indemnification provision that gives rise to NICTD's filing for a Motion for Summary Judgment on March 5, 2008, and the filing of a Motion for Summary Judgment by PORTSIDE of August 5, 2008, both parties claiming that they are entitled to summary judgment based upon the designation of evidence and pleadings in the record. Argument was presented to the Court on December 11, 2008, by NICTD and PORTSIDE through their attorneys before the Porter Superior Court, Valparaiso, Indiana. The Court considered arguments of counsel and took a ruling hereon under advisement.

The present posture of this case indicates that same is ripe for a ruling on both motions for summary judgment.

The relevant and material facts of this case are not in dispute.

As a result of the aforementioned collision between the truck and the train operated by NICTD, NICTD suffered losses exceeding Two Million Dollars ($2,000,000.00) by way of damage to its railroad cars, crossing signal equipment and was made party defendant to litigation by injured passengers as well as deceased passengers.

At the time of the aforementioned collision, NICTD had two (2) agreements which indemnified it against any and all loss which occurred at the crossing. One agreement was with Sequa Coatings Corporation, (hereafter "SEQUA") and the other with PORTSIDE. Both agreements contained substantially identical language of indemnification. Thereafter, NICTD elected to pursue its remedies on liability against SEQUA but held in abeyance any claims for indemnity on the PORTSIDE agreement.

Subsequently, the NICTD claims against SEQUA were resolved through an arbitration proceeding which concluded a reimbursement to NICTD by SEQUA of all its claims except for the sum of Two Hundred Twenty–One Thousand Six Hundred Thirty Dollars ($221,-630.00) representing a net loss to NICTD to the damages to Car # 11 owned by NICTD. This claim was not reimbursed by the arbitration process as aforementioned but has constituted a $221,630.00 loss to NICTD.[FN2] Therefore, NICTD's losses of the collision of June 18, 1998, in addition to being covered under the indemnification provision of the agreement between NICTD and SEQUA, were also covered under the indemnification provisions of the agreement between NICTD and PORTSIDE.

The total cost to repair Car # 11 owned by NICTD exceeded $1,100,000. This amount was paid by a ... $776,825.71 ... loan from NICTD's insurance company's deductible of ... $350,000. NICTD was then required to pursue other parties liable for the damages to Car # 11 and from any recovery thereof to reimburse its insurance company.

Thereafter, NICTD paid its insurance company its pro rata share $221,630.00 and has proceeded now against PORT-SIDE for such reimbursement. In addition, NICTD claims prejudgment interest at the rate of eight percent (8%) per annum from and after January 30, 2007. PORTSIDE contends it has no obligation to NICTD pursuant to the indemnification agreement and arbitration award [FN3] which determined there was no loss to NICTD.

By letter of January 30, 2007, from NICTD's attorney, a demand was made upon PORTSIDE for reimbursement of the $221,630.00. The Court treats this letter as the date of demand upon which the money was due NICTD from PORT-SIDE by virtue of the indemnification agreement.

Although at this juncture, PORTSIDE denies any liability or obligation to NICTD yet, in PORTSIDE's letter of March 8, 2002 to the attorney for NICTD it is stated that PORTSIDE would dismiss its claim against NICTD in return for an agreement that NICTD would not seek any indemnity against PORTSIDE "until your indemnity recovery from Sequa Coatings Corporation and National Steel Corporation are exhausted." Such communication indicates to this Court that PORTSIDE knew that NICTD was proceeding against SEQUA primarily and would later pursue PORTSIDE for any unreimbursed loss under the indemnity agreement. The indemnification agreement is

clear: "Full, complete, comprehensive and unconditional" means exactly that.

The conclusion of this Court therefore is that NICTD's Motion for Summary Judgment filed March 5, 2008, is hereby granted in all respects and that the Motion for Summary Judgment by PORT-SIDE filed August 5, 2008, is hereby denied in all respects.

NICTD is entitled to recover from PORTSIDE the claimed amount of $221,630.00 together with interest as called for by indemnity agreement under Section 25, plus reasonable attorney's fees for legal counsel for NICTD. The amount of such attorneys fees shall be determined by this Court at a subsequent hearing when this litigation has been concluded. The Court intends this Order to be final and appealable.

ALL OF WHICH IS ORDERED this 14th day of January, 2009.

---

FN2. The arbitrators were unaware that NICTD had been reimbursed by its insurance company in the amount of $221,630.00 as the insurance company's pro rata portion of a Three Hundred Fifty Thousand Dollars ($350,000.00) settlement with the trucking companies.

FN3. The arbitration award stated that NICTD "fully compensated for all property damage to Car # 11 resulting from the accident."

Appellant's App. p. 18–22. Portside now appeals.

## DISCUSSION AND DECISION

### I. Standard of Review

The trial court's decision on summary judgment enters appellate review clothed with a presumption of validity. *Malone v. Basey*, 770 N.E.2d 846, 850 (Ind.Ct.App. 2002). Nevertheless, summary judgment is appropriate only when there are no genuine issues as to any material fact and the moving party is entitled to judgment as a

matter of law. Ind. Trial Rule 56(C). "Relying upon specifically designated evidence, the moving party bears the burden with regard to these two components." *KPMG, Peat Marwick, LLP v. Carmel Fin. Corp.*, 784 N.E.2d 1057, 1059 (Ind.Ct. App.2003).

If the moving party meets these two requirements, the burden shifts to the non-movant to set forth specifically designated facts showing that there are genuine issues for trial. *Id.* at 1059–60. Genuine issues of material fact exist where facts concerning an issue that would dispose of the litigation are in dispute or where the undisputed material facts are capable of supporting conflicting inferences on such an issue. *Id.* at 1060.

On appeal, we are bound by the same standard as the trial court, and we only consider the evidence designated to the trial court. *Id.* "We liberally construe all designated evidentiary material in the light most favorable to the non-moving party to determine whether there is a genuine issue of material fact." *Id.* The appealing party has the burden of persuading us that the trial court erred. *Id.*

Finally, we note that when cross-motions for summary judgment are filed, the trial court must examine each motion and rule separately. *Lim v. White*, 661 N.E.2d 566, 568 (Ind.Ct.App.1996). Each party has the burden of separately demonstrating the non existence of a genuine issue of material fact and that it was entitled to summary judgment as a matter of law. *Hagerman Constr. Corp. v. Long Elec. Co.*, 741 N.E.2d 390, 391 (Ind.Ct.App.2000).

## II. Portside's Claims

### A. Indemnification—Willful and Wanton Misconduct

■ Although we have previously analyzed the validity of the agreement's indemnification terms in *Sequa Coatings Corp.*, Portside attempts to distinguish that holding,[2] asserting that there is a genuine issue of material fact as to whether Portside knowingly and willingly accepted the indemnity obligations that NICTD sought to impose. Portside suggests that if willful and wanton misconduct on the part of NICTD is found, the indemnification provision of the agreement would not be enforceable.

In addressing Portside's contention that the designated evidence establishes that NICTD engaged in willful and wanton misconduct, we observe that

According to our supreme court, a willful and wanton act of commission is: 'an intentional act done with the reckless disregard of the natural and probable consequence of injury to a known person under the circumstances known to the actor at the time.' *Witham v. Norfolk & W. Ry. Co.*, 561 N.E.2d 484, 486 (Ind. 1990). Correspondingly, a willful and wanton omission is described as: '[a] failure to act when the actor has actual knowledge of the natural and probable consequence of injury and his opportunity to avoid the risk.' *Id.* Whether the party has acted or failed to act, willful and wanton misconduct has 'two elements: 1) the defendant must have knowledge of an impending danger or consciousness of a course of misconduct calculated to result in probable injury; and 2) the actor's conduct must have

**2.** In *Sequa*, we determined, among other things, that the indemnity clause in the agreement was valid and not void as against public policy, NICTD did not conceal any danger of using the right-of-way, NICTD did not have superior bargaining power sufficient to render the agreement unconscionable, and the indemnity clause covered first-party claims. 796 N.E.2d at 1225–28.

exhibited an indifference to the consequences of his own conduct.' *Id.*

*Miner v. Southwest Sch. Corp.,* 755 N.E.2d 1110, 1114 (Ind.Ct.App.2001).

Although Portside claims that NICTD engaged in willful and wanton misconduct in light of its foreknowledge of broken gates and some prior near misses when truck drivers elected to go around downed gates, the designated evidence establishes that railroad crossings are, by their very nature, dangerous. Appellant's App. p. 956. Indeed, the FRA established that the average train speed at the Midwest Crossing was seventy-nine miles per hour. *Id.* Moreover, NICTD complied with all of the federal requirements regarding crossings and all state requirements that are set forth in the Manual of Uniform Traffic Control Devices. And Portside points to no violations of these requirements or conduct on NICTD's part that would give rise to any willful or wanton misconduct.

The evidence also established that NICTD endeavored to eliminate the crossings with the proposed construction of a new bridge. Its efforts involved the Indiana Department of Transportation, various governmental organizations that had to be consulted before the bridge could be constructed, the FRA Regional Crossing Manager, whose support was needed to obtain federal funding, and the cooperation of the industrial users, whose truck traffic created the problem. As a result of these actions, NICTD's conduct demonstrates anything but indifference.

Finally, it was Conrail's predecessor—New York Central—that narrowed the holding area by eighty feet in moving its railroad closer to the NICTD tracks. And it was the Conrail gate, which was controlled exclusively by Conrail, that came down within three seconds of receiving the signal of an approaching train, causing Lintz to stop.

In light of this evidence, it is clear that Portside alleges no facts that would demonstrate willful and wanton misconduct on the part of NICTD as required by our Supreme Court in *Witham.* Therefore, Portside's allegation that the indemnification provision is unenforceable fails on this basis.

### B. Applicability of Indemnity Clause in these Circumstances

■ Portside also contends that the language of the agreement did not obligate it to indemnify NICTD for the damages that resulted to its train car. Notwithstanding this claim, we need only examine the indemnification provisions set forth in the agreement:

> The phrase "Loss or Damage" as used within this Agreement shall be interpreted by the parties to *include any* and all loss of, damage to, or destruction of *any ... personal property ...* irrespective of whether the damaged or destroyed property is *owned or otherwise possessed by the Licensors,* Licensee, or a third party, and injury to or death of any person or persons whomsoever, including, without limitation, the parties to this Agreement, their agents, employees, customers, visitors, suppliers, and any and all non-parties *who use, occupy, or otherwise utilize the assets associated with,* or participate in the activities arising out of, *this Agreement.*

Appellant's App. p. 125 (emphases added).

In this case, NICTD's personal property, i.e., its train car, was damaged by Lintz, who was using the crossing, which was an asset associated with the agreement between Portside and NICTD. Additional provisions set forth in the agreement regarding indemnification state that

> The phrase "Claims, Settlements, Litigation, and Related Expenses" *shall include* any and *all losses, damages,* costs,

payments, and expenses of every kind and nature, including reasonable attorney fees and disbursements, *incurred by or attributable to any Licensor party, . . . as a result of claims,* demands, actions, suits, proceedings, judgments or settlements *arising out* of, in whole or in part, *or in any way connected with the Crossing,* the subject matter of any indemnity provision of this Agreement, or the activities of Licensee, its agents and its subcontractors at or near said Crossing.

*Id.* at 125 (emphases added).

As discussed above, the designated evidence established that the damages to NICTD's train car "arose out of" or "are connected with" the crossing. The damages occurred at the crossing and by reason of the crossing's use. Moreover, Portside promised in the agreement to "hold harmless, defend and indemnify NICTD," including NICTD's "cause of action" for its "loss or damage" to the train car, in any way related to or associated with the use of the crossing including NICTD's direct loss, even if caused by NICTD's activities. *Id.* at 126. In our view, this language unambiguously and unequivocally includes "negligence, misconduct, malfeasance or misfeasance by [NICTD]." *Id.*

In essence, Portside's suggestion that the accident did not "result from" or "arise out of" the agreement ignores the fact that the crossing existed for Portside's use and thus gave rise to any and all potential exposures risked by NICTD, including those involving the accident. As a result, Portside agreed to protect NICTD in all matters arising at the crossing, including damages that resulted to the train car. Therefore, Portside's contention that the indemnity clause does not apply fails.

### C. Transfer of Nondelegable Duties

■ Portside next argues that the indemnity provisions of the agreement are against public policy because the agreement effectively permits NICTD to transfer nondelegable duties to others. Portside also argues that the agreement amounts to a contract under Indiana Code section 26–2–5–1, which prohibits agreements that impose indemnification upon others for the benefit of those promising to perform construction or design work.

Notwithstanding Portside's claim that the agreement violated public policy, we discussed the enforceability of an identical indemnity clause in *Sequa.* In concluding that the agreement was enforceable, we relied on *Penn Central Co. v. Youngstown Sheet and Tube Co.,* 146 Ind.App. 216, 218–19, 253 N.E.2d 704, 706 (1969), where the evidence demonstrated that a motorist was crossing a Penn Central railroad track in his automobile when he was struck and injured by a train that was owned and operated by Youngstown. Penn Central sought to enforce the indemnity clause of its contract with Youngstown, which relieved Penn Central of its financial responsibilities if it was not the sole negligent actor. The *Penn Central* court recognized that the railroad had a nondelegable duty to use due care to protect motorists at the crossings. The court addressed public policy concerns, concluding that any lack of financial responsibility would not induce the railroad to ignore its safety responsibilities any more than negligent driving is induced from insured motorists. In discussing the *Penn Central* holding, the *Sequa* court observed that

Sequa entered into a contract with NICTD pursuant to which NICTD granted Sequa a right-of-way across its railroad tracks. In consideration for this right-of-way, Sequa agreed to indemnify NICTD for loss associated with Midwest Crossing. Thus, like *Penn Central,* we conclude that NICTD would not be induced to ignore its safety re-

sponsibilities merely because its agreement with Sequa contained an indemnity clause. . . .

*Sequa,* 796 N.E.2d at 1225.

In light of the above, we cannot say that there was any violation of public policy in providing passengers, motorists, or other injured parties additional sources from indemnification agreements to cover damages caused at a railroad crossing. Hence, Portside's public policy argument is unavailing.

■ In a related issue, Portside maintains that summary judgment was improperly entered for NICTD because the agreement amounts to a construction or design contract that is prohibited by Indiana Code section 26–2–5–1. Portside argues that "the license agreement between the parties contemplates construction, maintenance, and design for the crossing gates." Appellant's Br. p. 26.

In resolving this issue, we first turn to the provisions of Indiana Code section 26–2–5–1:

All provisions, clauses, covenants, or agreements contained in, collateral to, or affecting any construction or design contract except those pertaining to highway contracts, which purport to indemnify the promisee against liability for:

    (1) death or bodily injury to persons;

    (2) injury to property;

    (3) design defects; or

    (4) any other loss, damage or expense arising under either (1), (2) or (3);

from the sole negligence or willful misconduct of the promisee or the promisee's agents, servants or independent contractors who are directly responsible to the promisee, are against public policy and are void and unenforceable.

When considering this language, it is apparent that the agreement between Portside and NICTD is simply a license to use an already existing railroad crossing. The signals and gate sequence had long been established before the agreement was made and had never been changed from that time until the accident had occurred. Also, no evidence was submitted that any construction on the crossing had occurred in the timeframe between the agreement and the accident.

■ We further note that a license agreement is not a construction contract even though construction may have been involved in the execution of the contract. *Fort Wayne Cablevision v. Indiana–Michigan Elec.,* 443 N.E.2d 863 (Ind.Ct.App. 1983). In *Fort Wayne,* cable lines were erected on the electric company's utility poles, and we determined that it requires "strange usage and interpretation in order to consider it to be a construction contract." *Id.* at 869. Moreover, it has been held that indemnification agreements for the use of a railroad track by another railroad are enforceable to cover damages and injuries at a crossing and do not violate the provisions of Indiana Code section 26–5–2–1, even though the agreement provided for the reasonable construction of additional track. *Ogilvie v. Steel ex rel. Steele,* 452 N.E.2d 167, 170 (Ind.Ct.App. 1983).

Finally, in *Bethlehem Steel Corp. v. Sercon Corp.,* 654 N.E.2d 1163 (Ind.Ct.App. 1995), this court addressed the precise issue as to whether Indiana Code section 26–2–5–1 rendered indemnity provisions in maintenance contracts of previously created, built, or erected items unenforceable as against public policy. It was determined that the definition of "construction" was to be "the creation of something new, as distinguished from the repair or improvement of something already existing." *Id.* at 1167. As a result, indemnity provisions in agreements for maintenance are not

against public policy, and Indiana Code section 26–5–2–1 does not apply to a crossing previously designed and constructed many years before the agreement. Thus, Portside's claim fails.

### D. Breach of Agreement

■ Portside next claims that summary judgment was improperly entered for NICTD because the designated evidence established that NICTD breached the provisions of the agreement. As a result, Portside claims that NICTD's breach nullified the indemnification promise.

We note that Portside does not identify any failure on NICTD's part to comply with the specifications agreed to between NICTD and Midwest when the crossing's specifications were determined. Moreover, there is no showing that NICTD made any promise to Portside assuring Portside that no accident was possible. And it was Portside that insisted on the agreement to provide ingress and egress for its benefit. Indeed, it was not NICTD that needed the crossing.

Notwithstanding the above, Portside directs us to this court's opinion in *Salin Bank and Trust Co. v. Peden Trust*, 715 N.E.2d 1003 (Ind.Ct.App.1999), in support of its contention that NICTD breached the agreement. In *Salin*, the bank was attempting to extricate itself from its exercised option to purchase by maintaining that the owner did not meet the condition of providing the owner's appraisal to be used to determine price. The court held that the option to purchase had been exercised and was enforceable despite the owner's failure to meet a condition of providing an appraisal when the bank committed a breach by providing a defective appraisal. *Id.* at 1008–09.

Unlike the circumstances in *Salin*, here, the dangers or defects at the crossing—whatever they are or however they came about—are not critical to or involved with the purpose of the agreement to give Portside access to its facilities. To the contrary, the dangers or defects are recognized to exist by the parties through simple observation of Michigan transit ambling through the crossing as gates are coming down or the realization that an 83 foot long truck does not fit into a 58 foot space. In other words, the designated evidence fails to establish that NICTD created a defective crossing subsequent to the execution of the agreement.

Here, Portside would have known of the conditions at the crossing at the time of contracting. As a result, Portside's reliance on *Salin* is misplaced, and Portside's argument that NICTD in some way breached the agreement, rendering the indemnity clause unenforceable, is unavailing.

### E. Waiver, Estoppel, and Forfeiture

■ Finally, Portside maintains that the trial court erred in granting NICTD's motion for summary judgment because the designated evidence established that NICTD is estopped from enforcing the indemnity clause. Portside contends that "since NICTD obtained an unrestricted judgment against Sequa, collateral estoppels bars it from further litigation of its claim against Portside. It is barred by the principles of estoppel, waiver, and forfeiture." Appellant's Br. p. 27.

■ In addressing these contentions, we note that the doctrine of collateral estoppel generally operates to bar a subsequent re-litigation of the same fact or issue where that fact or issue was necessarily adjudicated in a former suit and the same fact or issue is presented in the subsequent lawsuit. *Sullivan v. Am. Cas. Co. of Reading, Pa.*, 605 N.E.2d 134, 137 (Ind. 1992). In that circumstance, the first adjudication will be held conclusive even if the second action is on a different claim.

*Id.* However, collateral estoppel requires the necessary adjudication in a former suit of the same issue presented in a subsequent suit. The former adjudication can only be conclusive as to those issues that were actually litigated and determined therein. Collateral estoppel does not extend to matters that were not expressly adjudicated and that can be inferred from the prior adjudication only by argument. *Ins. Co. of N. Am. v. Home Loan Corp.,* 862 N.E.2d 1230, 1233 (Ind.Ct.App.2007). Issue preclusion requires, among other things, identity of issues. *Id.*

Here, NICTD pursued its uncollected damages from Portside. These damages were a result of NICTD's satisfaction of an obligation to pay CIGNA a portion of the $350,000 in damages that was collected from the truckers. The arbitrators were unaware that such a payment had been made because it was not germane to the issues before them. Hence, the arbitrators did not determine whether the payment made by NICTD from the trucker's settlement to CIGNA was recoverable against Sequa or, for that matter, against Portside.

NICTD is not seeking damages beyond those that are due to it. And, as noted above, Portside is not challenging the *amount* of damages that it allegedly owes to NICTD. Rather, it is apparent that NICTD is seeking the damages that remain unpaid because of its previous repayment of a portion of CIGNA's loan. As a result, Portside cannot accurately claim that the issue had been "determined," and Portside cannot successfully contend that NICTD's claim is barred by collateral estoppel. *See Ins. Co. of N. Am.,* 862 N.E.2d at 1233 (observing that collateral estoppel does not extend to matters that were not expressly adjudicated).

In a related issue, Portside maintains that NICTD has waived its claim for in-demnification because "NICTD promised not to seek indemnity from Portside except in the event it failed to recover its losses from Sequa." Appellant's Br. p. 30. However, it is apparent that Portside is attempting to confuse NICTD's election not to pursue collection from Sequa in the matter as a waiver or forfeiture of its right to collect the balance of its damages from Portside. As we have already determined, NICTD was not estopped from pursing Portside for indemnification. And Portside has made no showing that NICTD knowingly waived any right to recover its damages to the train car or that NICTD forfeited its right to receive those damages. As a result, Portside's contentions fail.

### F. *Interest and Attorneys Fees*

Portside next claims that the trial court's award of attorney's fees to NICTD must be set aside because there is no language in the agreement regarding the recovery of costs or collection of attorneys fees. Moreover, Portside contends that because no court has determined that NICTD was entitled to indemnity prior to January 14, 2009, NICTD has failed to show that an amount had become "due" under the agreement. Appellant's Br. p. 31. Therefore, Portside maintains that the judgment regarding its payment of interest to NICTD must be set aside.

Notwithstanding Portside's contentions, we note that section 25(C) of the agreement defines the phrase "claims, settlements, litigation, and related expenses." Appellant's App. p. 125. And section 25(F) of the agreement states that "indemnification shall include, and is not limited to, reimbursement of any licensor party for its claims, settlements, litigation, and related expenses, which may be imposed upon, incurred by, or asserted against any licensor party or for which an licensor party may be held or become liable." *Id.*

When examining these terms, it is apparent to us that the language contained in the agreement clearly provides that NICTD's attorneys fees incurred in connection with the subject matter of any indemnity provision are covered as a part of "claims, settlement, litigation and related expenses" that Portside agreed to pay. Therefore, the trial court did not err in making this award to NICTD.

With regard to the payment of interest, we note that section 21 of the agreement provides that "any amounts not paid to any Licensor on or before *the date due* shall accrue interest." *Id.* at 123 (emphasis added). NICTD marks its due date from January 30, 2007, which is the date that it sent a demand letter to Portside directing it to cover NICTD's shortfall of $221,630. Appellant's App. p. 168. As this court has observed, "interest is to compensate for the loss of the time value of money, and when damages were ascertained in accordance with fixed rules of evidence and standards of valuation." *Harlan Bakeries, Inc. v. Muncy*, 835 N.E.2d 1018, 1030 (Ind. Ct.App.2005).

It is apparent that NICTD was deprived of its use of the train car and had to cover the costs of repairs from the date of the accident. And Portside knew of NICTD's claim against it when NICTD filed its counterclaim on January 10, 2003. Appellant's App. p. 307–330. Even though NICTD paid out the $221,630 that it now seeks from Portside on April 13, 2004, it nonetheless only requests the payment of interest as of the January 30, 2007, demand. In short, the record supports a conclusion that NICTD has lawfully ascertained its damages. Thus, it is entitled to interest for the loss of its "time value of money" from the time that it made its demand to Portside. Hence, Portside's claim fails.

## CONCLUSION

In light of our discussion above, we conclude that the trial court properly determined as a matter of law that NICTD did not engage in willful and wanton misconduct so as to negate the applicability of the indemnity provisions of the agreement between Portside and NICTD. Moreover, the damages that NICTD sustained to its train cars obligated Portside to pay for the loss under the agreement. Portside has not shown that NICTD engaged in the transfer of nondelegable duties, that the agreement was a construction contract within the meaning of Indiana Code section 26–2–5–1, or that NICTD had breached the agreement.

We also note that NICTD was not estopped from pursuing its claims against Portside and NICTD did not waive its rights to proceed against it. Finally, we find that the trial court properly ordered Portside to pay NICTD's attorney fees and prejudgment interest. As a result, we conclude that the trial court properly granted NICTD's motion for summary judgment.

The judgment of the trial court is affirmed.

FRIEDLANDER, J., and RILEY, J., concur.