John WITT, HydroTech Corp. and Mark Shere, Appellants–Plaintiffs,

v.

JAY PETROLEUM, INC. and Jack R. James, Appellees–Defendants.

No. 38A02–0912–CV–1290.

Court of Appeals of Indiana.

May 6, 2011.

---

Mark Shere, Indianapolis, IN, for John Witt & Mark Shere.

Julia Blackwell Gelinas, Maggie L. Smith, Frost Brown Todd LLC, Indianapolis, IN, for HydroTech Corp.

Christopher J. Braun, Stephanie T. Eckerle, Plews Shadley Racher & Braun LLP, Indianapolis, IN, for Jay Petroleum, Inc.

Rosemary G. Spalding, Allison Wells Gritton, Spalding & Hilmes, PC, Indianapolis, IN, for Jack R. James.

## OPINION

BAILEY, Judge.

### Case Summary

John ("John") Witt, HydroTech Corp. ("HydroTech"), and Mark Shere ("Shere") (collectively, "the Appellants") appeal from the trial court's award of attorneys' fees to Appellees Jay Petroleum, Inc. ("Jay"), and Jack R. James ("James") (collectively, "the Appellees") after the trial court held the Appellants in contempt of court for violating the terms of a temporary restraining order ("TRO").[1] We reverse.

### Issue

The parties present numerous issues for our review. In conformance with our opinion in this matter, we reframe the issues in this appeal, which are:

I. Whether the trial court erred when it issued the TRO, and whether we may review that decision; and

II. Whether the trial court erred when it found the Appellants were in contempt of court.

### Facts and Procedural History

*Facts and Proceedings before June 2008*

John and Amanda Witt, John's then-wife[2], purchased property in Portland, Indiana, that had been used as a gasoline filling station at various points during the prior fifty years.[3] Underground storage tanks ("USTs" or "tanks") were placed in the ground on the property; the USTs were used to store petroleum products sold at the gas station. When John and Amanda filed the suit underlying this case, there were five fiberglass tanks, which were installed in 1988, and one older metal UST formerly used to store heating oil.

On June 25, 2007, the Witts notified the Indiana Department of Environmental Management ("IDEM") that one or more of the USTs had leaked petroleum-based chemicals. IDEM instructed the Witts to install monitoring wells and to perform an Initial Site Characterization. The Witts retained Shere as their attorney to pursue their claims. In 2008, after the suit giving rise to this case had already been filed, the Witts retained HydroTech to perform this work, and agreed to pay HydroTech from any recovery the Witts obtained from the defendants. Among the defendants are the Appellees, Jay and James.

In October 2007, the Witts contacted Chris Braun ("Braun"), counsel for Jay, to attempt to reach a settlement agreement as to Jay's contribution to the costs of investigation and remediation of the contamination on the Witts' property. These attempts were unsuccessful, and on De-

---

1. We held oral argument on March 25, 2011. We thank the parties for their able advocacy.

2. As John's wife, Amanda was a party to this action at the trial court and during part of the pendency of this appeal. Amanda was subsequently divorced from John and in 2010 filed a petition for bankruptcy. Amanda sought and ultimately obtained dismissal from the instant appeal, and thus is no longer a named party in this matter.

3. The Witts did not use the property as a gas station, instead opening an automotive repair business that provided no fuel to customers.

cember 11, 2007, the Witts filed suit in the Jay Superior Court.

Local trial rules in Jay County permit any party to a civil case to submit to the court and all other parties a proposed discovery plan. The remaining parties are afforded 10 days to respond to the proposed plan, after which the trial court may consider and rule upon the discovery plan after a hearing. Jay County Local Rule LR38–TR26–3. On March 31, 2008, the Witts submitted to the trial court and served upon the various defendants their proposed discovery plan. During the first seven months of the litigation, from December 2007 to June 2008, the various defendants came into procedural alignment, filing numerous counterclaims, cross-claims, and third-party claims. No party to this action responded to the Witts' discovery plan.

Also during this period of time, Hydro-Tech continued its investigation on the Witts' property. On May 16, 2008, the Witts obtained a waiver of notice from IDEM, allowing them to close and remove the USTs under their land without filing a thirty-day notice ordinarily required by IDEM preceding such a closure operation. The waiver required the Witts to complete the closure work within ninety days of the waiver, with failure to do so requiring compliance with the thirty-day notice requirement going forward.

On June 3, 2008, the Witts, Jay, James, and various other parties engaged in a pre-trial discussion, the precise nature of which is unclear from the record. During this discussion, there was some talk of matters related to settlement of the litigation. Shere also attempted to determine what kinds of testing the various defendants intended to perform in their efforts to determine the allocation of liability among the defendants for contribution to the Witts' investigation and remediation efforts.

### June 11, 2008, Discovery Plan Conference

The trial court held a conference call with the parties on June 11, 2008, regarding the Witts' proposed discovery plan. During the call, the Witts expressed to the trial court their frustration with attempts to obtain information from Jay on the type of testing it hoped to perform on their property. The Witts also expressed concern that having to wait for Jay's testing requests would "stone wall" efforts to clean up the property. (Tr. 22.) Of particular concern in this regard was the likelihood that IDEM would order continued testing and cleanup of the site, and the Witts' continuing obligation under Indiana law to engage in cleanup activities with or without contribution from prior site owners and operators.

Jay told the court that it was amenable to pursuing settlement discussions, and that it had no objection to the Witts' continued cleanup activities. Even after the Witts informed the court and the parties at the hearing that the underground tanks could be removed within two weeks of the hearing, counsel for Jay stated, "If they want to pull the tanks in two (2) weeks that's fine. They can continue to go forward in their investigation ... we are not suggesting that we stop (inaudible) for sixty (60) days." (Tr. 24.) Jay continued, however, that it was concerned that HydroTech would "over excavate," that is, that HydroTech would dig beyond the impacted dirt beneath the underground tanks and dig "until you see clean dirt." (Tr. 25.) Jay argued this "could have a significant material impact on what's required in the future" for discovery. (Tr. 25.)

At the conclusion of the conference, the trial court deferred ruling on the Witts' proposed discovery plan, instead permit-

ting Jay and the other defendants to submit a proposed case management plan and permitting the Witts to file a responsive memorandum. Jay submitted its proposed plan to the court on Wednesday, June 18, 2008, and sent the plan to the Witts that day. Jay also sent a letter to the Witts on June 18, 2008, that, while not specifically repudiating its in-court acquiescence to the Witts' tank removal within two weeks of the June 11 conference, nevertheless requested that the Witts

> provide each counsel of record with written notice at least seven (7) business days in advance of the date the USTs will be removed so that the Defendants can coordinate having their own environmental consultants present at the Site while this UST removal and related testing work is being performed and our consultants can observe the work being performed and perform their own testing.

(Witt/Shere Joint App. 192.)

### Intervening Events

Much of what occurred from June 18 to Thursday, June 26, 2008, is documented by correspondence between the Witts and Jay and argument before the trial court on June 27, 2008, supplemented by an affidavit and testimony from an employee for Jay's environmental contractor.

On June 24, 2008, Shere returned to his office from an out-of-town trip to find Jay's proposed case management plan and its letter requesting that the Witts provide seven business days' advance notice to the defendants before removing any of the tanks. Shere contacted Braun that day, and Braun returned Shere's call the following day, but it was not until June 26,

2008, that the parties' attorneys were in direct contact with each other.

On the morning of June 26, 2008, the Witts and Jay engaged in several brief, heated phone conversations regarding Jay's request to have its contractor on the Witts' property for tank removal and to take and test soil samples.[4] With the Witts and Jay unable to reach an agreement on what soil samples the defendants could take and what testing would occur, Jay informed the Witts that it would send a contractor to their property to perform testing "in accordance with IDEM's requirements and protocols."[5] (Witt/Shere Joint App. 196.)

At around 11:30 a.m. on June 26, 2008, while the Witts and Jay were engaged in a series of phone calls and written correspondence, Travis Erny ("Erny"), an employee of Quality Environmental Professionals, Inc. ("QEPI"), which Jay hired to serve as an environmental consultant, left the QEPI offices for the Witts' property. Erny arrived at the Witts' property at around 1:30 p.m. and spoke with Hydro-Tech's on-site project manager, John Flowers ("Flowers"). Flowers would not permit Erny onto the property without permission from either Shere or Cory Smith ("Smith"), another employee of HydroTech.

Jay sought permission through Shere, as counsel for the Witts, for Erny to perform sampling and testing. The Witts in return set forth specific requirements for entry and testing and stipulations for Jay to make, and refused to allow Erny to enter their land to engage in any sampling or testing without Jay's agreement to these

---

4. Two e-mails, one from the Witts and one from Jay, set forth somewhat differing accounts of the discussions early on the morning of June 26, 2008.

5. Jay's letter did not provide information as to the exact chemical constituents, process by which samples would be taken, timing, and other details.

terms.[6] Jay refused, the Witts ultimately denied Erny permission to enter the site.

Erny remained just off the property and took photographs of HydroTech's work as it progressed through the afternoon of June 26th. At some point during the afternoon, John or a representative of Hydro-Tech called police, who arrived at around 4:35 p.m. and informed Erny that he would be arrested for trespassing if he re-entered the site. Erny took a few more photographs from the street and returned to Indianapolis once work at the site had concluded for the day.

In the final piece of correspondence on June 26, 2008, Jay complained that the ejection of Erny from the Witts' property and continued UST removal without any of the defendants' representatives on-site

> result[ed] in irreparable harm to the Defendants in their necessary efforts to ... properly investigate and document the source, types and extent of contamination ... as the soil is disturbed and the USTs are removed, evaluate compliance with IDEM's UST removal and testing requirements, and to inspect the USTs for leaks. The Defendants are entitled to do this without any waiver of any rights, claims, or defenses they have, including, but not limited to, spoliation of evidence.

(Witt/Shere Joint App. 215.)

Jay then informed the Witts that it would seek injunctive relief from the trial court the next day "to stop any UST removal work at the Witts [sic] site until the Defendants are granted the necessary and reasonable access they are entitled to at the Witts [sic] site on reasonable terms and without the imposition of the unrea-

sonable provisions" in the Witts' letter earlier that day. (Witt/Shere Joint App. 215–216.) Jay invited the Witts to participate in the hearing telephonically or in person.

### June 27, 2008, TRO Hearing

Braun appeared in person on Jay's behalf before the trial court on the morning of the following day, June 27, 2008. Erny was present at the hearing to assist Jay. Counsel for the other defendants and for the Witts participated in the hearing by conference call. Jay submitted its Verified Motion for Temporary Restraining Order and Preliminary Injunction to the court, and included as exhibits the letters between itself and the Witts, as well as Erny's affidavit relating his activities at the Witts' property.

The trial court acknowledged that the hearing came at short notice to the Witts, and suggested that they might want additional time to read Jay's motion; despite the suggestion, the trial court nevertheless proceeded with the hearing. The trial court expressed an understanding that Jay's motion sought "preservation of the conditions of the site and ... meaningful opportunity for all parties to be able to participate in any changes in the site and monitor those changes and so forth." (Tr. 58.) The Witts told the court that they had received little to no cooperation on discovery issues, including when and how the defendants wanted to proceed with soil sampling and testing. They also characterized the site's "status quo" not as it stood at the time of the hearing—partially excavated, with tanks already removed from the ground—but the site pre-excavation. (Tr. 59.) The Witts further in-

---

**6.** These included waiving any claims related to spoliation of evidence, use of split samples taken and provided by HydroTech, testing at a laboratory of QEPI's choice for chemical constituents identified by HydroTech, and timing for the exchange of testing results. The Witts indicated that Jay's acceptance of these terms would impose no restrictions on future inspection and sampling of the property.

formed the court that since filing their proposed discovery plan in March 2008 through the date of the June 27 hearing, they had been unsuccessful in obtaining any meaningful participation or cooperation, including feedback on sampling, testing, and inspection protocols from the Defendants.

The Witts then went on to characterize the motion as "a motion to compel discovery" (Tr. 59), even though no formal discovery request had been served by the defendants. The Witts pointed to the June 11 hearing as providing notice to the defendants of the likely schedule for removal of the USTs. They further indicated that there were IDEM-imposed deadlines requiring removal of the tanks [7], and argued that the defendants had "a hidden agenda here and a real game going on" and that Jay knew that work was happening at the Witts' property and "manufactured this dispute." (Tr. 60.) The Witts directed the court's attention to one of the documents Jay had attached to the motion, which was a response Braun had sent to one of Shere's e-mail messages, into which Braun had inserted glosses to Shere's original message. Jay ultimately produced a copy of the original version of the message to the court, but only upon the Witts' strenuous request to the trial court that Jay provide that version.

Jay spoke for all of the defendants and characterized the Witts' arguments before the court as "manipulation." (Tr. 61.) Jay argued that the defendants had clearly indicated their need for involvement in soil sampling and excavation on the site during the June 11 court conference and during a meeting of counsel on June 3 preceding the court conference. Jay also insisted that the Witts had failed to provide the defendants with the seven days' notice before removing the USTs, as Jay and the other defendants had requested in the June 18 letter. Jay pointed out that the first communication it had with the Witts after the June 11 conference came on June 24, several days after the June 18 letter had been sent, and complained that the Witts' initial phone message conveyed no information about the UST removal already being underway. Jay did not, however, dispute that the Witts had attempted to develop a discovery plan prior to the June 27 hearing.

Jay stated that it was only on June 26 that the Witts explained the extent of the progress on the removal of the USTs. Jay insisted that it was unacceptable for the Witts to attempt to determine the scope of the defendants' discovery on the UST excavations, and that every moment HydroTech worked on the site resulted in more destruction of evidence, depriving the Defendants of the opportunity to do "meaningful testing." (Tr. 71.) The Witts responded that Jay's sudden demand for involvement in discovery after six months of delay and unresponsiveness to their inquiries about sampling was an attempt to derail the cleanup, force excessive expense in discovery, and conceal evidence. Jay retorted that the Witts' demands were unreasonable and that their treatment of Erny when he arrived onsite on June 26 was inappropriate, stating, "our patience with these games we've played and lack of notice, is expired. So we're asking intervention." (Tr. 72.)

The trial court determined that the issues involved in discovery were sufficiently complex that expert testimony would be necessary to understand what testing was at issue and the effect of the excavation

---

7. Testimony given at the Preliminary Injunction hearing the following week indicated that

IDEM was often willing to be flexible in its deadlines when kept apprised of delays.

upon the ability to engage in testing of the site. The court went on to state:

> I haven't heard anything today though that has convinced me that a brief delay in further excavation at the site is not going to potentially create an irreparable harm to the defendants because of their inability to preserve the site pending a further hearing by the court. I am going to go ahead and grant the motion ... and I am proposing that we set this matter for hearing on the preliminary injunction.... We can't undue [sic] what's already been done, but we, at least, can attempt to preserve the status quo until we give all parties a more fair opportunity to explain to the court why it is or is not going to be a problem if certain testing is conducted.

(Tr. 73.)

> The trial court then issued the TRO, which enjoined the Witts and Hydro-Tech from conducting UST removal, soil excavation, or other environmental investigation and remediation activities on the Property until the Court can schedule a preliminary injunction hearing to at which [sic] all parties will be provided notice of Jay Petroleum's request that its consultant, QEPI, shall be allowed to observe the UST removal activities and be allowed to collect split samples.

(Witt/Shere Joint App. 50–51.) Having granted the TRO, the trial court went on to set a hearing date for a proposed preliminary injunction hearing and set a security bond for the TRO.

*Additional Events on June 27, 2008*

After the hearing concluded, Erny went from the courthouse to the Witts' property and took photographs of any continuing work on the site. At this time, around 10:30 a.m., John told Erny to "take a photo of this" and directed several rude gestures at Erny. (Tr. 140.)

Immediately after the hearing and pursuant to the trial court's request, Shere conducted phone conversations with John and Smith to inform them of the provisions of the order. Smith expressed "a firm opinion that open tank pits could not safely be left on site without fill." (Witt/Shere Joint App. 374.) Shere expressed his belief that the judge did not want "the site to be left in an unsafe condition" and that "it [met] the letter and spirit of his instructions for these pits to be backfilled, as recommended, as part of a safe demobilization." (Witt/Shere Joint App. 374.) Shere also stated that "the instructions today also allow HydroTech to collect the normal samples from the tank pits before backfilling," that otherwise "it is guaranteed that re-excavation for new sampling will be needed later," and that it was his impression that HydroTech's activities going forward would not prevent later re-excavation and sampling by Jay Petroleum in compliance with any subsequent order of the trial court. (Witt/Shere Joint App. 374.) Thus, the status quo of the site would be preserved.

Based upon consultation with Shere and his instructions in response, HydroTech continued to work, backfilling the pits.[8] At around 1:45 p.m., a representative of the Jay County Sheriff served the TRO papers upon the Witts. After stopping work briefly while the deputy was present, HydroTech apparently restarted its work to safely demobilize the site until around

---

8. There is some dispute as to whether samples were taken after the TRO was entered. Erny testified that he saw Flowers wearing nitrile gloves and collecting soil from the ground; Smith testified once that additional samples were taken, but later testified that no samples were taken after the TRO was entered. Despite the conflicting evidence, in its contempt order the trial court found that additional soil samples were taken.

3:30 or 3:45 p.m., when two additional deputies appeared and instructed the Witts and HydroTech to stop all work at the site. The two deputies allowed HydroTech to put up barrels and snow fencing around the edges of the tank pits to prevent accidents and to move an excavator to a corner of the property to allow traffic to enter the Witts' property. After this, work stopped on the site. Also around this time, the trial court held a conference call with the Witts and Jay to determine whether work had stopped.[9]

*July 2, 2008 through July 10, 2008*

The trial court held a hearing on Jay's motion for a preliminary injunction on July 2, 2008, and which continued over much of July 3, 9, and 10. Also on July 2, 2008, Jay filed its Verified Motion for Contempt of Court ("Motion for Contempt") against the Witts, HydroTech, Smith, and Flowers.[10] The Witts filed their Opposition to the Motion for Preliminary Injunction the same day.

The hearing was conducted to allow the trial court to hear evidence and arguments for and against issuing a preliminary injunction to govern sampling and excavation activities on the Witts' property as those activities related to the need for discovery in the Witts' suit against the Defendants. The trial court indicated on several occasions that it was not the purpose of the hearing to advance evidence or arguments related to the Motion for Con-

tempt, and limited the introduction of evidence with bearing only upon the Motion for Contempt rather than upon the merits of the Motion for Preliminary Injunction. Nevertheless, both Jay and the Witts regularly pursued lines of questioning related directly to Jay's Verified Motion for Contempt, frequently over one another's objection and occasionally with the indulgence of the trial court.

Early in the course of the hearing, Shere told the court that the Witts and HydroTech backfilled the tank pits pursuant to his advice and interpretation of the TRO.[11] In response, on July 25, 2008, Jay amended its Motion for Contempt to seek a finding of contempt against Shere as well as the Witts and HydroTech. During much of the hearing, Erny and another QEPI employee, Anne Detjen Black ("Black"), presented testimony regarding the procedure for UST removal and the IDEM-required soil and groundwater testing, as well as likely effects upon site conditions and evidence of the backfilling HydroTech performed. Erny also testified that the precautions HydroTech had used to safeguard the UST tank pits before June 27, 2008—snow fencing placed around the edge of the tank pits—were standard within the industry. Finally, photographic evidence and testimony were produced regarding the events of June 27, 2008, on the Witts' property.

9. Shere's declaration to the trial court, submitted in opposition to the Motion for Contempt, includes a statement that Braun demanded that the Witts and employees of HydroTech be arrested upon learning work had not ceased. There is no transcript of the call, however.

10. Shere served as counsel for the Witts and for HydroTech in subsequent matters related to the Verified Motion.

11. In his joint brief with the Witts, Shere makes much of the trial court's description of his forthrightness in informing the trial court about the need for samples either to be analyzed or destroyed. To the extent that his actions were intended "to avoid contempt" (Tr. 326), Shere's reliance upon the trial court's statement perhaps overstates his case. He may have been forthright about the samples' existence, but seems to take no regard for the fact that even taking the samples may have been a willful violation of the TRO.

Smith testified in response to Erny and Black. In addition to responding to questions about UST removal procedures, Smith also testified regarding the events of June 27, 2008. He indicated that HydroTech had used snow fencing and barrels to secure the pits during the active site excavations before June 27, 2008, but that he was concerned that the TRO's ten-day term would require a multiple-week work stoppage at the site pending a preliminary injunction. Smith indicated that groundwater and rainwater regularly accumulated in the pits, which not only might affect the distribution of contaminated soil within the pits, but also threatened to cause the pit walls to subside. Such subsidence was of concern to Smith because he was worried that several structures could be damaged if a pit wall were to collapse, including a canopy and a nearby alley.

Smith also testified that though the snow fencing and barrels were generally sufficient for brief work stoppages, a more thorough safety procedure, such as backfilling, was necessary to make the site safe in order to prevent injury to individuals who might attempt to jump into the pits. Smith thus asserted that, under the circumstances, the best possible approach to preserving the site and securing the pits was to backfill them. Lacking adequate clean fill material to complete the backfilling without reusing already-excavated materials, HydroTech used some of the old fill, which remained on-hand. Smith indicated that he was unaware of any IDEM regulation or guidance that would preclude such reuse of old soil and fill, at least on a temporary basis.

*Subsequent Relevant Procedural History*

At the close of the hearing, the trial court indicated that it would issue a preliminary injunction, but that its final form would be set forth in writing at a later time. On July 14, 2008, the trial court issued the Preliminary Injunction, and entered two minor corrected findings of fact on August 1, 2008. The trial court did not rule on the Motion for Contempt, and on August 5, 2008, James filed a Joinder in Jay's Motion for Contempt.

On December 31, 2008, the Honorable Joel Roberts, the initial trial judge for this matter, retired with the Motion for Contempt still pending. On June 11, 2009, after several false starts in obtaining a special judge to preside over this case, the Honorable Mark. E. Spitzer assumed jurisdiction as Special Judge. With the parties to the Motion for Contempt having agreed to no further evidentiary hearings, on November 9, 2009, the trial court heard argument of counsel on the Motion for Contempt.

On December 9, 2009, relying on evidence introduced primarily from the Preliminary Injunction hearing, the trial court held the Appellants in contempt, prescribed discovery-related sanctions against the Witts, and held all of the Appellants jointly and severally liable for any monetary damages arising from the contempt. At this time, the trial court requested petitions, briefing, and evidence on appropriate attorneys' fees and other costs associated with the contempt. The trial court also found no reason for delay and entered the contempt order as a final judgment under Trial Rule 54(B).

On February 4, 2010, the trial court heard argument of counsel on the fee petitions. On March 18, 2010, the trial court entered its Order on Fee Petitions, and awarded $108,487.32 in joint and several damages against the Appellants. The trial court again found no just reason for delay and entered the order as a final judgment pursuant to Trial Rule 54(B).

This appeal followed.

## Discussion and Decision

### *The TRO*

Among the issues the parties address is the nature of the June 27 TRO and whether the Appellants may challenge the order itself on appeal, or merely the contempt finding and attorneys' fees arising from it. In their appeal, Shere and the Witts contend that the trial court abused its discretion in issuing both the TRO and the Preliminary Injunction. Indeed, they contend that the TRO was in fact a preliminary injunction, with the Preliminary Injunction retroactively amending the TRO.[12] Through this argument, Shere and the Witts seek to draw our attention to the fact that neither the TRO nor the Preliminary Injunction conform to the legal standards for a preliminary injunction, thus encouraging this court to reverse the trial court's entry of the TRO.

For their part, the Appellees respond that the TRO is a temporary restraining order, not a preliminary injunction. Because temporary restraining orders are not subject to appellate review, *N. Ind. Public Serv. Co. (NIPSCO) v. LaPorte,* 791 N.E.2d 271, 275 (Ind.Ct.App.2003), the Appellants did not seek interlocutory appeal within thirty days of the issuing of the TRO, *cf.* Ind. Appellate Rule 12(B)(1)(a), and the restraining order would now be moot, the Appellees argue that we cannot consider an appeal of the TRO upon which the contempt order depends.

 Because we decide the case on different grounds—namely, that it was error for the trial court to find the Appel-

lants in contempt—we need not decide this issue today. We note the general rule that substance prevails over form in determining the exact nature of a given order. *See, e.g., Ind. Alcoholic Beverage Comm'n v. Progressive Enterprises, Inc.,* 259 Ind. 315, 286 N.E.2d 836, 837 (1972) (holding that a temporary restraining order "which is entered after notice and an evidentiary hearing ... is in fact a preliminary injunction" and thus construing it as a preliminary injunction). Whatever its true nature, however, we think that the TRO was improvidently granted.[13]

The trial court entered the TRO to avoid the loss of evidence, rather than to prevent harm to the subject matter of the litigation. This corresponds more closely and accurately with the use of a court order to resolve discovery disputes under Trial Rule 37 or a protective order under Trial Rule 26 than it does with the temporary restraining order-to-preliminary injunction path. Indeed, our examination of correspondence between the Witts and Jay in the days leading up to the entry of the TRO reveals that what Jay sought was most akin to a request for entry onto land under our discovery rules.

Trial Rule 34 allows a party to request "entry upon designated land ... for the purpose of inspection and measuring, surveying, photographing, testing, or sampling the property or any designated object or operation thereon." Ind. Trial Rule 34(A)(2). No such request was formally served upon the Witts, however. The Witts refused to provide entry onto their land under Jay's proposed terms be-

**12.** HydroTech does not join in this argument, directing its briefs only to the contempt order and order for payment of attorneys' fees.

**13.** The Witts and Shere indirectly explore the possibility that the TRO is in fact properly construed as a discovery order, and indeed the Witts argued in this vein when the TRO

was first granted. None of the Appellants advance that argument here, and both Appellants' and Appellees' seeming agreement that the TRO was some form of injunction under Trial Rule 65 obviates any need to probe this matter further.

cause Jay refused to disclose the nature of the sampling and testing it intended to perform, indicating only that it would perform split sampling pursuant to IDEM guidelines.[14] That is, Jay's request failed to observe the provisions of Trial Rule 34(B), which requires that a party's request "specify a reasonable time, place, and manner of making the inspection and performing the related acts," which would require that Jay disclose the "manner," i.e., the method, of its inspection and sampling activities. Jay refused to do so, instead seemingly instructing the Witts as to its intended activities, indicating when it would enter onto their land to perform split sampling while withholding from the Witts information on the testing methods and protocols it would use to test the samples.

■ The trial court's order, given the discovery-centered exchange between the Witts and Jay, is thus puzzling. Rather than ordering discovery, the trial court instead ordered that the Witts' environmental remediation and investigation activities cease entirely. The only reason we can discern for this is that the trial court

entered the type of order Jay requested. Rather than serve a formal discovery request under Trial Rule 34 and, if necessary, submit a motion to compel discovery under Trial Rule 37, Jay instead sought a temporary restraining under Trial Rule 65, submitting a proposed order that would be entered as the TRO which ultimately led to this appeal. Thus, we think the TRO was improvidently entered in part because it accomplishes a goal other than what the evidence before the trial court indicated should be done—the TRO ordered that the Witts' remediation cease, rather than that Jay's discovery continue.[15]

■ We thus strongly disagree with Jay's contention at oral argument that a temporary restraining order is "one way" of obtaining discovery. It is not. Preliminary injunctions, of which a restraining order is one type, are "remed[ies] ... generally used to preserve the status quo as it existed *prior to a controversy* pending a full determination on the merits of that controversy."[16] *U.S. Land Servs., Inc. v. U.S. Surveyor, Inc.,* 826 N.E.2d 49, 67 (Ind.Ct.App.2005) (emphasis added) (citing *Tomahawk Vill. Apartments v.*

14. Split sampling involves the division of a given sample of soil or other material for independent testing. Here, each party's environmental contractor would take a portion of the sample to an independent laboratory for testing to establish the presence and amounts of any number of chemical constituents within the samples taken from the soil. This process ensures that each party may test soil from the same location on the site, while being afforded the opportunity to independently verify test results.

15. We take this opportunity to remind the trial court that while it is permissible to use or adopt proposed orders supplied by parties, such action should be taken carefully and with an eye toward the correctness of the proposed order so adopted. As we have noted in other contexts, such a practice "weakens our confidence as an appellate court that

the findings are the result of considered judgment by the trial court," though we in any event inquire into adopted orders in conformance with our established standards of review. *In re Marriage of Nickels,* 834 N.E.2d 1091, 1096 (Ind.Ct.App.2005) (quoting *Cook v. Whitsell–Sherman,* 796 N.E.2d 271, 273 n. 1 (Ind.2003)) (reviewing adopted findings of fact and conclusions of law).

16. The trial court relied in its contempt order on *Harlan Bakeries, Inc. v. Muncy,* 835 N.E.2d 1018 (Ind.Ct.App.2005). While the trial court in *Harlan* entered the TRO after the case was initiated, its entry was intended to preserve the substantive rights of both sides to a boundary-line dispute. *Id.* at 1040. This is one of a number of points upon which *Harlan* differs from this case, and which makes *Harlan* inapposite to the matter we decide today.

*Farren,* 571 N.E.2d 1286, 1292 (Ind.Ct. App.1991)) (noting that neither party "focuses on the purpose of a preliminary injunction" and partially reversing a trial court's grant of a preliminary injunction in a trade secrets case). Such preliminary injunctions are intended to prevent harm to a party that could not be remedied at final judgment. *Scales v. Hospitality House of Bedford,* 593 N.E.2d 1283, 1286 (Ind.Ct.App.1992), *trans. denied.* They are "extraordinary remed[ies] that should be used sparingly," granted only "in rare circumstances in which the law and facts are clearly within the moving party's favor." *Crossmann Communities, Inc. v. Dean,* 767 N.E.2d 1035, 1040 (Ind.Ct.App. 2002) (finding that the trial court abused its discretion in granting a preliminary injunction following a restraining order).

In seeking a restraining order more than seven months after the filing of the underlying action, and more than nine months after first learning of the Witts' claims against it, Jay sought extraordinary relief for what is an ordinary discovery dispute. Nor can we ignore that Jay's decision to pursue the TRO bears the hallmarks of a manufactured emergency. Jay was, it claims, compelled to pursue emergency relief to preserve evidence in the face of the Witts' remediation of their land. But this emergency was of Jay's own making: it represented to the trial court on June 11, 2008, that it had no objection to the Witts' continued remediation of their property, then reversed its position in its letter to the Witts on June 18, 2008. Moreover, this came after the Witts had been attempting since March 2008 to obtain information from Jay and the other defendants as to any testing or other discovery they planned to pursue, and after all of the defendants had foregone any opportunity to comment on the Witts' proposed discovery plan.

Rather than follow our trial rules as they apply to such attempts to obtain discovery, Jay instead stepped outside the ordinarily proper course of action when it sought to enjoin the continued remediation of the Witts' property, expressing its concerns that evidence might be lost—though a similar claim was rejected by the highest court of one of our sister States. *See AJ & K Operating Co. v. Smith,* 355 Ark. 510, 140 S.W.3d 475, 482 (2004) (holding, where Plaintiffs insisted that an injunction against remediation by Defendants be upheld, that "the contention in this case that remediation could destroy evidence for a trial on damages does not constitute irreparable harm").[17] Jay did so on the heels of an emergency of its own creation, both after it had failed to comport itself according to the Indiana Trial Rules and also after it had failed to respond several months earlier to the Witts' proposed discovery plan under Jay County's local rules.

Because we are constrained from directly reviewing the TRO, we do not—indeed, we cannot—reverse the trial court on the basis of its improvidential grant of the order. We nevertheless take a dim view of the later proceedings against the Appellants that follow under the TRO's aegis. Both Indiana and Federal courts have in the past roundly rejected discovery as gamesmanship; we reiterate our disapproval of such conduct today.[18]

---

**17.** Indeed, our search for applicable case law reveals only *Smith* as an example of a TRO used to enjoin continued remediation of land contaminated by petrochemicals.

**18.** *See, e.g., Outback Steakhouse of Florida, Inc. v. Markley,* 856 N.E.2d 65, 76 (Ind.2006) (quoting, *inter alia, United States v. Procter & Gamble Co.,* 356 U.S. 677, 682, 78 S.Ct. 983, 2 L.Ed.2d 1077 (1958)).

*Whether the Trial Court Erred when it Found the Appellants in Contempt*

The Appellants also challenge the trial court's contempt order, contending that the safety rationale behind backfilling the UST pits after the trial court issued the TRO on June 27 precludes a finding of contempt.

## Standard of Review

Before turning to the merits of this question, we must resolve a question as to the appropriate standard of review in this case. Ordinarily, we review a contempt finding for an abuse of discretion, reversing only when the trial court's order is contrary to the evidence and logical inferences that support the finding, or when the trial court's order is contrary to law. *Reed Sign Serv., Inc. v. Reid*, 755 N.E.2d 690, 698 (Ind.Ct.App.2001), *aff'd on reh'g*, 760 N.E.2d 1102 (Ind.Ct.App.2001), *trans. denied*. The Appellants argue that we should instead apply a *de novo* standard of review because the trial court ruled on the Appellees' contempt motion relying only upon a paper record of the evidence. The Appellees respond that the interests undergirding the authority of the courts to hold individuals in contempt—the dignity of the courts and the importance of permitting courts to adjudicate disputes without interference with judicial process—require that the abuse of discretion standard be maintained. *See City of Gary v. Major*, 822 N.E.2d 165, 169 (Ind.2005) (listing "among the inherent powers of a court is that of maintaining its dignity, securing obedience to its process and rules, rebuking interference with the conduct of business, and punishing unseemly behavior").

Though we find no Indiana case dealing with the exclusive use of a paper record in a contempt proceeding, this court and our supreme court have held in numerous other cases that a trial court's reliance upon a paper record to reach findings of fact warrant the more stringent *de novo* standard of review. *See, e.g., Equicor Devel., Inc. v. Westfield–Washington Township Plan Comm'n*, 758 N.E.2d 34, 37 (Ind.2001) (applying *de novo* review to appellate review of a trial court's decision on *certiorari* from a zoning decision); *GKN Co. v. Magness*, 744 N.E.2d 397, 401 (Ind.2001) (applying *de novo* review to a paper record used to make findings of fact as to disputed evidence upon a motion to dismiss for lack of subject matter jurisdiction under Trial Rule 12(B)(1)); *Pigg v. State*, 929 N.E.2d 799, 804 (Ind.Ct.App. 2010) (appellate review of an order denying a motion to compel an attorney to disgorge allegedly unearned fees), *trans. denied*. The *de novo* standard of review, then, is appropriate where a reviewing court is in as good a position as the trial court to make a decision on a particular issue based upon the evidence presented, particularly where there are facts in dispute but no evidentiary hearing was held. *GKN*, 744 N.E.2d at 401.

Here, the Appellants were found in contempt of the trial court's June 27, 2008, TRO on December 9, 2009—nearly one and one-half years after the trial court issued the TRO and Jay filed its initial motion for contempt. By December 2009, the original judge in this matter, Judge Roberts, had retired and Judge Spitzer had assumed jurisdiction as a special judge. The parties offered the trial court no evidence beyond the paper exhibits submitted along with the parties' briefs on the motion for contempt, and no additional evidence was heard.[19] That is, aside from

---

19. The Appellees argue that additional evidence was received by the trial court at the hearing on the motion for contempt. This consisted of a single volume with bound cop-

the arguments of counsel—which do not constitute testimony—the trial court under Judge Spitzer was in no better position than this court to assess the credibility of the witnesses who offered testimony at the Preliminary Injunction hearing under Judge Roberts, nor did it have any greater ability to assess the documents and other elements of the paper record in deciding on the motion for contempt. We therefore review the trial court's finding of contempt *de novo.*

Under the *de novo* standard, the trial court's ruling is presumed to be correct, and we will affirm the judgment of the trial court on any legal theory the evidence of record supports. *GKN Co. v. Magness,* 744 N.E.2d 397, 401 (Ind.2001). We may reverse the trial court "only if the appellant persuades us that the balance of evidence is tipped against the trial court's findings." *Id.*

### Whether Violation of the Provisions of the TRO was Willful

■ Here, the trial court determined that the provisions of the TRO were unambiguous and that the Appellants' conduct on June 27, 2008 constituted "willful disobedience" of the order. (Witt/Shere Joint App. 84.) The trial court further found the Appellees' safety rationale to be unpersuasive and a *post hoc* justification for contemptuous violation of the TRO. After a thorough review of the record, we cannot agree.

We first return to the problematic nature of the TRO. Given what it sought to constrain and the circumstances under which it was granted—in essence, as an attempt to sidestep the proper conduct of discovery under our Trial Rules—we necessarily look closely at the contempt finding against the Appellants that follows from the TRO's enforcement. In this re-

ies of documents already entered into the

gard, as we noted above, the TRO seems to have been improvidently granted in that it came as the result of Jay's self-created emergency and addressed not the discovery problem for which it was purportedly sought, but rather the Witts' remediation activities.

■ We also take note of the purpose of contempt. The nature of the contempt finding here is that of civil indirect contempt. Indirect contempt "is the willful disobedience of any lawfully entered court order of which the offender has notice." *City of Gary,* 822 N.E.2d at 169 (quoting *Andrews v. State,* 505 N.E.2d 815, 830 (Ind.Ct.App.1987) (emphasis omitted from original)). We are mindful that

[i]t lies within the inherent power of the trial court to fashion an appropriate punishment for the disobedience of its order. *MacIntosh v. MacIntosh,* 749 N.E.2d 626, 631 (Ind.Ct.App.2001), *trans. denied.* Unlike criminal indirect contempt, the primary objective of a civil contempt proceeding is not to punish the contemnor but to coerce action for the benefit of the aggrieved party. *Thompson v. Thompson,* 811 N.E.2d 888, 905 (Ind.Ct.App.2004), *trans. denied* (2005).... "Nevertheless, a contempt order which neither coerces compliance with a court order or compensates the aggrieved party for loss, and does not offer an opportunity for the recalcitrant party to purge himself, may not be imposed in a civil contempt proceeding." *Flash [v. Holtsclaw],* 789 N.E.2d [955] at 959 [ (Ind.Ct.App.2003) ].

*In re Paternity of M.P.M.W.,* 908 N.E.2d 1205, 1209 (Ind.Ct.App.2009).

Our review of the record persuades us that the Appellants did not willfully violate the TRO, and that in any event holding them in contempt nearly one-and-one-half

record with the motion for contempt.

years after the TRO was issued could have served no coercive purpose or offered any opportunity for the Appellants to purge themselves of contempt. Having thus issued the order as an apparent penalty for conduct that did not constitute a willful violation of the TRO, the trial court erred when it held the Appellants in contempt.

The trial court found the Appellants' safety rationale to be unpersuasive, noting that Shere had communicated the existence of the TRO to HydroTech and John Witt and that the acknowledged purpose of the TRO was to preserve evidence and the status quo at the site, and determined that the Appellants' proffered safety explanation lacked credibility. Yet our review of the record reveals that, though he had received an e-mail with the proposed order attached, Shere had not yet seen the text of the TRO, nor had the Witts or Hydro-Tech. Nor did the TRO, coming more than seven months after the commencement of the action and after several days of excavation and investigation having already taken place on the Witts' property, serve to maintain the proper status quo prior to a controversy, that is, the pre-action status of the property. *See U.S. Land Servs.*, 826 N.E.2d at 67. While the trial court relied in part on *Harlan Bakeries, Inc. v. Muncy*, 835 N.E.2d 1018 (Ind. Ct.App.2005), in which the trial court entered a TRO as to the use of land on a disputed boundary line, the appropriate purpose of such a TRO is to preserve the disputed subject matter of the litigation, not to direct discovery or limit the remediation of contaminated property. *See AJ & K*, 140 S.W.3d at 482.

Moreover, the safety rationale advanced by the Appellants, which the trial court characterized as an unpersuasive "*post hoc* justification," (Witt/Shere Joint App. 82) is borne out by the record. Indeed, there is no evidence contrary to Smith's explana-

tions for the backfilling. Shere sent an email at 12:28 on June 27, 2008—the day the trial court issued the TRO—to the Witts and to HydroTech confirming discussions among them that morning that stemmed from their attempts to comply with the as-yet unread order. The email confirms that HydroTech recommended backfilling the tank pits for safety reasons.

Thus, the decision to backfill the tank pits was not done in derogation of the terms of the order, but, rather, the record shows that the backfilling was performed in order to ensure a "safe demobilization at the site." (Witt/Shere Joint App. 531.) Of particular note is that Judge Roberts would insist the following week that the site was not yet secure enough for his liking, even after partial backfilling that deviated from what the trial court characterized as "industry standards" for safety by making the tank pits *more shallow*, and thus *less hazardous* than they would have been with the "industry standard" snow fencing. (Witt/Shere Joint App. 82.) The safety concern was raised and followed upon contemporaneous with the entry of the TRO—that is, the evidence supports an inference that the tank pits were backfilled in an attempt to comply with the TRO, and not as a *post hoc* rationale for action taken to willfully disobey an order.

We further note that there was no evidence presented that contradicts Smith's assessment of the safety needs at the site. Smith testified that the high water table on the Witts' property made groundwater infiltration and the caving-in of pit walls persistent threats during HydroTech's remediation work, with the possible effect of a cave-in of particular concern with respect to the integrity of structures on and near the Witts' property. Smith's testimony agreed with that of Erny as to the routine use of snow fencing to mark off tank pits. Yet Erny's testimony did not

take into account the possibility of groundwater infiltration or pit wall collapse over an extended period of time, though Erny did agree that groundwater infiltration and subsidence could pose a problem for testing and safety. Moreover, the existence of groundwater-related issues was confirmed by the presence of a vacuum truck on the Witts' property. Erny observed one such truck on June 26, 2008, Smith testified that the truck was used to remove groundwater that had partially flooded the tank pits, and manifests indicating that around ten thousand gallons of water had been pumped out of the pits were introduced into evidence corroborating the testimony.

Smith also expressed serious safety concerns in light of the prospect posed by the TRO of leaving the tank pits open for two weeks or more, with nothing but barrels and snow fencing to safeguard deep, open pits, the largest of which was "ten (10) to fifteen (15) feet across, twenty (20) feet long and ... about thirteen feet deep" (Tr. 602), that had already filled with potentially contaminated water earlier in the week. Thus, the safety concerns associated with simply ceasing work at the Witts' property were reasonable and militate against a determination that HydroTech's backfilling of the pits was a willful violation of the TRO.[20]

Also undercutting a contempt finding is that Jay's proposed TRO—which bears the precise language subsequently adopted by the trial court when it entered the TRO on June 27, 2008—does not indicate that the Witts and HydroTech were to "cease and desist" all work activities, though Jay could easily have tendered a proposed order containing those words.[21] The TRO

instead enjoined the Witts and their agents and HydroTech from "conducting UST removal, soil excavation, or other environmental investigation and remediation activities." (Witt/Shere Joint App. 56–57.) The TRO did not enjoin the precaution-taking necessary to ensure that the work site would not pose a threat to the public. We note again in this regard that the trial court expressed its opinion that the site was not sufficiently safe during the hearings on the preliminary injunction only a few days after the entry of the TRO. Judge Roberts's concerns arose in part because snow fencing had collapsed and posed no obstacle to individuals gaining entry to the pits, at least one of which had partially filled with water after HydroTech had been forced to stop its work. In addition, Jay conceded at oral argument before this court that HydroTech could have continued to use the vacuum trucks to remove water from the UST pits—even though this would constitute some form of remediation work—in order to maintain the status quo.

Our review of the record thus reveals that HydroTech's backfilling of the tank pits was not done in willful violation of the TRO, but was instead intended to ensure that the Appellants would have safely complied with the order. Moreover, the order was silent as to the security and safety of the site after cessation of excavation or environmental investigation and remediation work—which were the only activities enjoined by the TRO. Thus, it was error for the trial court to find the Appellants in contempt for backfilling the site.

---

20. We note that Smith's concerns about water infiltration were confirmed by his visit to the Witts' property on July 4 and July 5, 2008, when he observed that groundwater had accumulated in one of the partially backfilled pits.

21. Indeed, we note that the precise phrase, "cease and desist," was used by both the Appellants and the Appellees during oral argument before this court.

It was also error to find the Appellants in contempt for any testing that was performed on June 27, 2008. It is unclear from the record whether the testing performed by HydroTech occurred before or after the Appellants learned of the TRO. There is testimony from Erny that he observed Flowers taking soil samples, or at least taking soil from the edge of the tank pit and placing it into a plastic baggie; it is unknown whether this soil was tested or whether the Witts would have used any test results as evidence at any point in the case. Further, Smith's testimony as to whether samples were taken at the site before or after the TRO is unclear; at one point he seems to indicate that this is so, but later clearly states that no samples were taken after the Witts and HydroTech learned of the TRO from Shere. Given this evidence before the trial court in the form of a paper record, we cannot conclude that the trial court had sufficient evidence from which to hold that the Appellants were in contempt of court for any soil sampling activities.

Finally, the trial court apparently relied on John's rude gestures toward Erny in arriving at its contempt determination. While this conduct came after the entry of the TRO, Erny was not an agent of the court and therefore John's conduct was not directed toward the court. Moreover, it occurred during a period of time in which all the Appellants were attempting to come to grips with the requirement of the TRO. John's contempt toward Erny hardly translates to demonstrated, willful contempt for the court, and it was error for the trial court to conclude otherwise.

### Whether the Contempt was Coercive or Punitive

■■■ Even if the Appellants had acted in willful violation of the terms of the TRO, holding the Appellants in contempt would not have served any purpose in coercing the Appellants to comply with the TRO, and thus the trial court erred in holding the Appellants in contempt and in assessing sanctions against them. As we have already noted, the contempt order was entered nearly eighteen months after the TRO was entered, after sampling had already been conducted, and after the UST system had been closed and the tanks removed in August 2008. In the intervening period, the TRO was replaced by a Preliminary Injunction with substantially different terms, which were arrived at after a hearing lasting multiple days and relied in part on an access and testing agreement negotiated between representatives of QEPI and HydroTech only during the course of the hearing. Whatever subsequent conduct may have occurred—none of which was presented to the trial court in the record of Jay's and James's contempt motion, which addressed itself exclusively to events prior to July 2, 2008—a finding that any of the Appellants were in contempt serves no coercive purpose with respect to the TRO or the subsequent Preliminary Injunction. Nor was any intent to coerce compliance with any other court order expressed in the trial court's contempt findings. Indeed, our review of the Chronological Case Summary and the other documents submitted to this court indicate that the Appellants complied with the Preliminary Injunction and all other court orders.

Moreover, the sanctions the trial court assessed against the Appellants—over $108,000 in attorneys' fees and other costs, as well as other litigation-related penalties—seems to us vastly out of proportion with any violation of the TRO that would lead to any loss or spoliation of evidence. Erny indicated that whether the pits flooded with water, subsided, or were backfilled, there was a substantial likelihood that the soil in the pits was subject to

contamination such that the evidentiary value of soil samples from the pits would have been similarly impaired in any case. Nor, given the safety issues presented and in evidence, can we agree with the trial court's determination that the Appellants acted with "abiding disregard for the significance of their actions." (Witt/Shere Joint App. 91.) Indeed, the trial court's contempt order finds the Appellants had spoiled evidence and holds them in contempt for such conduct—despite the fact that the possibility of a spoliation claim was raised by both the Witts and Jay *before* the TRO was issued, and thus at least some of that conduct cannot have been subject to a contempt order arising from a violation of the TRO. In short, the Appellants' contempt likely would not have mattered much to the Appellees' case, and thus there is little or no substantial harm to compensate through an order of damages.

Moreover, we cannot agree with the trial court that the several days-long preliminary injunction hearing was the *result* of the Appellants' conduct. The hearing would have occurred in support of Jay's motion for the preliminary injunction, and thus it was improper to assess fees and costs against the Appellants for anything other than what was needed to prove contempt. In terms of evidence, this amounts to an affidavit, photographs, and testimony from Erny and Smith. Awarding fees and costs for the entirety of the Preliminary Injunction hearing was thus excessive.

The trial court's contempt order and the sanctions assessed against the Appellants were punitive in nature, not coercive. Such use of a contempt order is outside the bounds of what is permissible for civil indirect contempt.

### Conclusion

The trial court erred when it held the Appellants in contempt of court, both be-

cause the TRO was improvidently granted and because the Appellants' conduct on June 27, 2008, did not constitute a willful violation of the terms of the order. Moreover, even if the Appellants had willfully violated the TRO's terms, holding the Appellants in contempt nearly eighteen months after the TRO was entered and rendered moot by a subsequent preliminary injunction served no coercive purpose, but was instead a punitive measure impermissible in an indirect civil contempt proceeding.

Reversed.

NAJAM, J., and DARDEN, J., concur.